The **SUSQUEHANNA CORPORATION** et al., Appellants,

v.

**PAN AMERICAN SULPHUR COMPANY** et al., Appellees.

No. 27920.

United States Court of Appeals, Fifth Circuit.

March 13, 1970.

Charles S. Rhyne, Rhyne & Rhyne, David M. Dixon, Washington, D. C., Cox, Smith, Smith, Hale & Guenther, San Antonio, Tex., Brown, Erwin, Maroney & Barber, Jay H. Brown, Austin, Tex., for appellants.

Philip A. Loomis, Jr., Gen. Counsel, for SEC, Washington, D. C., amicus curiae.

Leon Jaworski, B. J. Bradshaw, Dan G. Matthews, Thomas R. McDade, Houston, Tex., Carl Wright Johnson, San Antonio, Tex., Donald S. Thomas, Austin, Tex., for appellees; Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., of counsel.

William Kay Wilde, Houston, Tex., Bracewell & Patterson, Houston, Tex., for appellee, Bracewell & Patterson & Co.

Before GEWIN, THORNBERRY and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

This is a hard-fought contest between two giant corporations of the business and financial world, which involves application of the new tender offer provisions enacted in 1968 as amendments [1]

---

1. The specific amendments which are especially pertinent here are found in Sections 14(d) (1), 14(e) and 13(d) (1), which are 15 U.S.C. §§ 78n(d) (1), 78n(e)

to the Securities Exchange Act of 1934 (The Act) (15 U.S.C. § 78a et seq.). The principal question for decision is whether the tender offeror violated the disclosure and anti-fraud provisions of the Act, and regulations thereunder, 'in connection with the making and consummation of a successful tender offer. Another important issue is whether the present suit is barred by respondents' plea of res judicata predicated on plaintiffs' voluntary dismissal with prejudice of a similar complaint filed in the United States District Court at Boston, Massachusetts.

Suit was filed below by Pan American Sulphur Company (PASCO) and two of its stockholders (another stockholder intervened later) against the Susquehanna Corporation (Susquehanna) and three individuals who are officers and directors of Susquehanna, alleging violation by defendants of the disclosure and anti-fraud provisions of the Act in Susquehanna's successful tender offer to purchase 1,-800,000 shares of PASCO stock at $40 per share, a total of $72,000,000 and 38 per cent of the outstanding stock.[2] The market price of the stock was said to be $35 per share at that time. Judgment is sought requiring Susquehanna to divest itself of the PASCO stock acquired through the tender offer; or, in the alternative, a permanent injunction is sought against Susquehanna prohibiting it from voting the PASCO stock.

The case was tried in the District Court on PASCO's motion for a preliminary injunction to enjoin Susquehanna from voting its PASCO stock pending final hearing of this suit.[3] An exhaustive six-day hearing was held and the District Judge granted a preliminary injunction ordering that Susquehanna not vote the PASCO stock purchased by it in connection with the tender offer; that composition of the PASCO Board of Directors remain as is; and that the annual meeting of PASCO stockholders not be held until a final trial of the case on the merits.

In a brief memorandum opinion the District Judge held that PASCO had sustained its burden of proof that there is a reasonable probability that it can prove that Susquehanna had undisclosed intentions to merge PASCO with another company as soon as control was obtained, and that there is a reasonable probability that Susquehanna's admitted intention to take over control of PASCO's Board was not properly disclosed in its written statements to the Securities and Exchange Commission. The Court held that the tender offer and anti-fraud provisions of the Act must not be violated with impunity, and that under the circumstances it was its duty to provide such remedies as are necessary to make effective the congressional purpose relating to full and complete disclosure.

Pan American Sulphur Company's net income in 1968 was $5,500,000, and its stock is listed on the New York Stock Exchange. Among other assets, it has approximately $60,000,000 in cash and owns 34 per cent of the capital stock of a Mexican corporation, Azufrera. Its principal offices are in Texas. The Susquehanna Corporation, which is endeavoring to take over control of PASCO, had net income of $12,500,000 in 1968, and its stock is listed on the American Stock Exchange. Its headquarters are in Virginia, is licensed to do business in Texas, and has plants in 27 locations and employs over 5,000 employees.

The gravamen of plaintiffs' complaint is found in allegations that the tender

---

and 78m(d) (1), respectively, of the Securities Exchange Act of 1934 as amended July 29, 1968.

2. Plaintiffs state that the suit is based upon Sections 10(b), 13(d) (1), 14(d) (1), 14(e) and 29(b) of the Act (15 U.S. C. §§ 78j(b), 78m(d) (1), 78n(d) (1), 78n(e) and 78cc(b)), and Regulation

240.14(b) (1) and Rule 10b-5 of the Securities and Exchange Commission.

3. Plaintiffs also sought to enjoin defendants Korholz, Bradley and Sloan, who are Susquehanna designees on the PASCO Board of Directors, from acting in that capacity during pendency of this suit.

offeror, Susquehanna, failed to comply "in material respects" with the provisions of the Act and rules and regulations of the SEC and fraudulently "omitted to state material facts" concerning

4. See the following pertinent provisions of the Securities Exchange Act of 1934 as amended:

Section 14(d) (1) [15 U.S.C. § 78n(d) (1)]:

"It shall be unlawful for any person, directly or indirectly, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, to make a tender offer for, or a request or invitation for tenders of, any class of any equity security which is registered pursuant to [section 78l] section 12 of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than 10 per centum of such class, unless at the time copies of the offer or request or invitation are first published or sent or given to security holders such person has filed with the Commission a statement containing such of the information specified in [section 78m(d)] section 13(d) of this title, and such additional information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. All requests or invitations for tenders or advertisements making a tender offer or requesting or inviting tenders of such a security shall be filed as a part of such statement and shall contain such of the information contained in such statement as the Commission may by rules and regulations prescribe. Copies of any additional material soliciting or requesting such tender offers subsequent to the initial solicitation or request shall contain such information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors, and shall be filed with the Commission not later than the time copies of such material are first published or sent or given to security holders. Copies of all statements, in the form in which such material is furnished to security holders and the Commission, shall be sent to the issuer not later than the date such material is first published

its intentions in connection with the acquisition of PASCO stock under the tender offer, and the filing of Schedule 13D statements required by the Act, especially the disclosure provisions,[4] and regula-

or sent or given to any security holders."

Section 13(d) (1) [15 U.S.C. § 78m(d) (1)]:

"(d) (1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78l of this title or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, is directly or indirectly the beneficial owner of more than 10 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors—

\* \* \* \* \*

"(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

\* \* \* \*

"(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the person with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof."

Section 14(e) [15 U.S.C. § 78n(e)]:

"(e) It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the

tions established thereunder.[5] There are two main contentions raised by PASCO as to the alleged fraud and misrepresentations of Susquehanna, alleged to be "materially false and misleading," which are summarized as follows:

1) Susquehanna did not disclose in its Schedule 13D statements that it was trying to obtain control of PASCO by electing a majority of Susquehanna's representatives to the PASCO Board of Directors.

2) Susquehanna did not disclose in its Schedule 13D statements that it intended to merge PASCO with American Smelting and Refining Company (ASARCO), or some other corporation.

circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation."

5. SEC Regulation 14d-1, 17 C.F.R. § 240.14d-1, reads in pertinent part as follows:
"(a) No person, directly or indirectly, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, shall make a tender offer for, or a request or invitation for tenders of, any class of any equity security which is registered pursuant to section 12 of the Act, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than 10 per centum of such class, unless, at the time copies of the offer or request or invitation are first published or sent or given to security holders, such person has filed with the Commission a statement containing the information and exhibits required by Schedule 13D: * * *."

6. SEC Regulation 14d-4, 17 C.F.R. § 240.14d-4, reads as follows:
"(a) No solicitation or recommendation to the holders of a security to accept or reject a tender offer or request or invitation for tenders subject to Section 14(d) of the Act shall be made unless, at the time copies of the solicitation or

Following several meetings and discussions between representatives of Susquehanna and PASCO about a proposed tender offer, Susquehanna, on November 25, 1968 (amended November 26, 1968), filed its Schedule 13D statement announcing its intention to purchase 1,800,000 shares at $40 per share of PASCO's outstanding 4,751,342 shares of common stock. A copy of the Schedule 13D statement had been sent to PASCO by Susquehanna on November 6, 1968. The tender offer was advertised beginning November 27, 1968 and noted to expire on December 6, 1968. On November 27, 1968, PASCO filed a Schedule 14D statement, required by the Act (Section 14(d)(4), 15 U.S.C. § 78n(d)(4)) and SEC regulations,[6] in which PASCO's manage-

recommendation are first published or sent or given to holders of the security, the person making such solicitation or recommendation has filed with the Commission a statement containing the information specified by Schedule 14D: *Provided, however*, that this rule shall not apply to (1) a person required by Rule 14d-1(a) to file a statement, or (2) a person, other than the issuer or the management of the issuer, who makes no written solicitations or recommendations other than solicitations or recommendations copies of which have been filed with the Commission pursuant to this rule of Rule 14d-1: *And, provided further*, that any person making a solicitation or recommendation to the holders of a security to accept or reject a tender offer or request or invitation for tenders which solicitation or recommendation commenced prior to July 30, 1968 shall, if such solicitation or recommendation continues after such date, file the statement required by this rule on or before August 12, 1968.
"(b) If any material change occurs in the facts set forth in the statement required by paragraph (a) of this rule, the person who filed such statement shall promptly file with the Commission an amendment disclosing such change.
"(c) Any written solicitation or recommendation to the holders of a security to accept or reject a tender offer or request or invitation for tenders subject to Section 14(d) of the Act shall include the name of the person making such solicitation or recommendation and the information required by Items 1(b), 2(b) of Schedule 14D or a fair and ade-

ment stated that it was "greatly concerned about the offer as it may affect its shareholders" and that "The Company cautions its shareholders against acceptance of such tender offer" for reasons which were explained in an attached press release. Subsequent Schedule 14D statements were filed by PASCO on November 29, December 2 and December 3, 1968.

In the meanwhile, on November 29, 1968, PASCO filed suit in United States District Court in Massachusetts to restrain Susquehanna from purchasing PASCO stock under the tender offer. The PASCO suit in the Massachusetts Federal Court was based on alleged deficiencies and misrepresentations in Susquehanna's Schedule 13D statements in that Susquehanna had failed to submit copies of the statement to PASCO on SEC form, had not revealed its plan to use PASCO's cash assets as a source of funds to repay loans obtained by Susquehanna to finance the tender offer, had failed to describe its plans or proposals relating to the disposition of PASCO's cash assets, had failed to disclose that Susquehanna owned or had the right to acquire other shares of PASCO, and had failed to provide information relating to Susquehanna's loan arrangements in connection with refinancing

PASCO's securities it proposed to acquire pursuant to its tender offer.

A hearing was held in the Massachusetts Federal Court on December 5, 1968, and after plaintiff rested its case a voluntary dismissal with prejudice was taken by PASCO provided Susquehanna would extend its tender offer until December 12, 1968. Susquehanna did not extend its offer on December 6, 1968 but did so on December 10, 1968, to expire on December 12, 1968.

On December 6, 1968, Susquehanna's President telephoned PASCO's President suggesting a merger of PASCO with ASARCO. Thereafter, on December 10, 1968, the President of Susquehanna sent a telegram to the President of ASARCO proposing to negotiate a merger between PASCO and ASARCO, subject to approval of the Boards of PASCO and ASARCO, and stating possible terms for such a merger. The full text of the telegram is reproduced in the margin.[7]

On December 12, 1968, at the expiration of its tender offer, Susquehanna acquired 1,800,000 shares of PASCO's stock pursuant to the offer, more than that number of shares having been offered. On the same day PASCO repudiated the ASARCO merger offer made by the President of Susquehanna and denied

---

quate summary thereof: *Provided, however*, that such written solicitation or recommendation may omit any of such information previously furnished to the persons to whom the solicitation or recommendation is made."

7. "December 10, 1968
DAY LETTER
Board of Directors
American Smelting & Refining Company
120 Broadway
New York, New York
Attention: Mr. E. Tittmann, Chairman
Mr. R. D. Bradford, President
"Pasco, listed on the New York Stock Exchange, subject to the approval of its and American Smelting's Board is prepared to extend an offer to all American Smelting stockholders to exchange their stock for $80 of 5½% convertible debentures plus ¾ of a share of common plus

½ warrant for each share held. Total package to have a market value of not less than $125 at the date of issue nor more than $140.
"Pasco would expect the transaction to be on an asset basis and since the majority of the assets would be derived from the American Smelting merger, it would be prepared in order to assure the continuity of AR management to offer one-half of the total directorships to present directors of American Smelting.
"If this proposal is of interest, please call me at Alexandria, Virginia, 703–354–8000 to furnish you with any additional details and to arrange for an immediate meeting with Mr. Harry Webb, President of Pan American Sulphur Company.
THE SUSQUEHANNA
CORPORATION
H. F. Korholz
President"

the authority of Susquehanna or its President to make such a proposal.

The present suit was filed on March 14, 1969 and a hearing on the motion for a preliminary injunction was held beginning on April 11, 1969 and ending on April 18, 1969.

At the outset we must consider respondent Susquehanna's plea of res judicata to the present suit based on PASCO's dismissal with prejudice of its prior litigation in the Massachusetts Federal Court, it being asserted that the causes of action were and are the same and are grounded on alleged misrepresentations by Susquehanna in its Schedule 13D statements filed with the SEC in connection with the PASCO tender offer. PASCO answers that the plea of res judicata is not well founded because the present suit is based upon misrepresentations in amended Schedule 13D statements of Susquehanna which were filed after the Massachusetts litigation was voluntarily dismissed and after Susquehanna's original Schedule 13D statement was filed.

PASCO also contends that fraudulent representations and conduct of appellants, of which it complains, could not have been the basis of the Massachusetts Federal Court litigation because they were not known, having been concealed by Susquehanna until after dismissal of the prior suit.

We have concluded that the most expeditious disposition of this case can be made by pretermitting the plea of res judicata, because of the action we shall take in connection with the alleged misrepresentations contained in the several Schedule 13D statements of Susquehanna. We, therefore, consider the main contentions of PASCO which go to the heart and substance of the case itself.

1) Susquehanna did not disclose in its Schedule 13D statements that it was trying to obtain control of PASCO by electing a majority of Susquehanna's representatives to the PASCO Board of Directors.

Susquehanna's written responses to Items 4 and 6 of its Schedule 13D statements are pertinent to a discussion of whether it is guilty of misrepresentation and concealment of its intentions to control a majority of PASCO's Board with its designees.[8]

The SEC's Schedule 13D provides instructions to the tender offeror regarding the information to be included in the various items in the schedule.[9] Item 4,

---

8. Susquehanna's original Schedule 13D statement was filed on November 25, 1968 and thereafter in amendments thereto on November 26, 1968, December 9, 1968, December 12, 1968 and December 20, 1968, in each of which the statements made in Items 4 and 6 were reaffirmed.

9. The pertinent instructions are as follows:

Schedule 13D
Information to Be Included in Statements Filed Pursuant to Rule 13d–1 or 14d–1
Notes. A. The item numbers and captions of the items shall be included but the text of the items are to be omitted. The answers to the items shall be so prepared as to indicate clearly the coverage of the items without referring to the text of the items. Answer every item. If an item is inapplicable or the answer is in the negative, so state.
\* \* \* \* \*
Item. 4. Purpose of Transaction.
State the purpose or purposes of the purchase or proposed purchase of securities of the issuer. If the purpose or one of the purposes of the purchase or proposed purchase is to acquire control of the business of the issuer, describe any plans of proposals which the purchasers may have to liquidate the issuer, to sell its assets or to merge it with any other persons, or to make any other major change in its business or corporate structure, including, if the issuer is a registered closed-end investment company, any plans or proposals to make any changes in its investment policy for which a vote would be required by Section 13 of the Investment Company Act of 1940.
\* \* \* \* \*
Item 6. Contracts, Arrangements, or Understandings with Respect to Securities of the Issuer.
Furnish information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not

"Purpose of Transaction," requires that if the purpose or one of the purposes of the purchase or proposed purchase is to acquire control of the business of the issuer, any plans or proposals which the purchasers may have to liquidate the issuer, sell its assets or merge it with any other persons or make any other major change in its business or corporate structure must be stated. Pursuant to these instructions, Susquehanna's information in Item 4, in full, reads as follows:

"Item 4. Purpose of Transaction

"Pan American had 4,751,342, shares of common stock issued and outstanding as of October 31, 1968. Susquehanna through its offer intends to purchase 1,800,000 shares at $40 per share, which, if acquired, should in the opinion of Susquehanna's Management, give Susquehanna working control of Pan American. If control is achieved, it is contemplated that the business of Pan American will be conducted as a subsidiary of Susquehanna serving as its natural resources arm.

"Susquehanna does not plan or propose to liquidate Pan American, to sell its assets to, or merge it with, any other person, or to make any other major change in its business or corporate structure. However, if, at some subsequent time, it should appear the interests of the Pan American stockholders would be better served by any of the foregoing courses of action, Susquehanna may propose or adopt such course.

"Susquehanna does not intend to purchase any shares of Pan American other than pursuant to this Offer during the period of this Offer, or any extension thereof. However, at any time after the expiration of this Offer, or any extension thereof, Susquehanna reserves the right to purchase shares

of Pan American over the New York Stock Exchange, or otherwise."

Item 6 of Schedule 13D, "Contracts, Arrangements or Understandings with Respect to Securities of the Issuer," requires the furnishing of information as to any contracts, arrangements or understandings with any person with respect to any securities of issuer such as transfer of securities, joint ventures, loans or option arrangements, etc. Susquehanna filed the following, in full, as its Item 6:

"Item 6. Contracts, Arrangements or Understandings with Respect to Securities of Issuer

"Neither Susquehanna, nor its officers or directors, or any of their associates has any contracts, arrangements or understandings with respect to the securities of Pan American. However, Pan American's Certificate of Incorporation does not provide for cumulative voting, and accordingly ownership of 1,800,000 shares will not insure any representation on the Board of Directors of Pan American. If, however, Susquehanna acquires 1,800,000 shares pursuant to this Offer, it expects to request Pan American's Board of Directors to fill the two vacancies now existing on its Board of Directors with persons designated by Susquehanna. The designees of Susquehanna will be selected from its directors and officers listed herein. It is possible that representatives of Pan American will be invited to occupy any vacant seats on Susquehanna's Board."

 Susquehanna's response to Item 4 clearly states that control of PASCO is the object of its tender offer. The response states that "Susquehanna through its offer intends to purchase 1,800,000 shares of $40 per share, which, if acquired, should in the opinion of Susque-

limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or prof-

its, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements or understandings have been entered into, and giving the details thereof.

hanna's Management, give Susquehanna *working control of Pan American.* If control is achieved, it is contemplated that the business of Pan American will be conducted *as a subsidiary* of Susquehanna serving as its natural resources arm." (Emphasis supplied.) Also, after stating that Susquehanna has no plans or proposals "to liquidate Pan American, to sell its assets to, or merge it with, any other person, or to make any other major change in its business or corporate structure," the Item 4 response states that "if, at some subsequent time, it should appear the interests of the Pan American stockholders would be better served by any of the foregoing courses of action, Susquehanna may propose or adopt such course." These statements by Susquehanna were accurate representations of its intentions and actions on the issue of control. The Item 4 statement was fair notice to the target corporation, its shareholders and the general investing public, of Susquehanna's intentions relative to control of PASCO should the tender offer be successful.

In light of Susquehanna's statements, a reasonable stockholder or general investor would realize that Susquehanna intended to exercise strong control over PASCO.[10]

The record unmistakably shows that PASCO itself adequately understood Susquehanna's intentions and in fact undertook to inform its stockholders of those intentions. PASCO's Schedule 14D statement,[11] filed and published on the day following Susquehanna's 13D statement, recommended that its shareholders reject the cash tender offer, pointing out among other things that Susquehanna's object was to gain control of PASCO. Thus, in successive days the shareholders had published information that Susquehanna sought control, PASCO's statement that it did, and PASCO's recommendation that the shareholders reject the tender offer. The shareholders and the public investor were, therefore, fully advised on the subject of offeror's intention to control.

With greater reason, we do not believe that the officers and directors of PASCO were misled.

The complaint filed in the Massachusetts Federal Court by PASCO likewise states that the purpose of Susquehanna's tender offer is "to acquire control of PASCO's business."[12] Nor can it prop-

---

10. We are not holding that there cannot be a case where the successful tender offeror might choose not to replace the incumbent board of directors and its 13D notice so indicated. Therefore, an offeror cannot lull officers, shareholders and general investors into believing that it will retain the incumbent directors if it in fact intends to replace those directors. But as a general rule, control of a corporation is exercised through its board of directors, and thus a successful tender offeror can usually be expected to place its own designees on the target corporation's board of directors. Control is the normal, expected result of a successful tender offer. Such is the case here for Susquehanna made no attempt to mislead the management or shareholders of PASCO or the general investing public.
See Adolph Berle, The Price of Power: Sale of Corporate Control, 50 Cornell Law Quarterly 628, 630, 631 (1965).

11. PASCO's Schedule 14D statements (DX J, K, L, M) show this beyond doubt:

1. 14D filed November 27, 1968, from attached Press Release: "Susquehanna has stated that its object is to gain control of PASCO."

2. 14D filed November 29, 1968, from attached Press Release: "Susquehanna has emphatically stated that its object is to take control of PASCO * * *."
3. 14D filed December 2, 1968, from attached Press Release: "(b) A full and complete disclosure that, while disclosing that the purpose of said tender offer was to acquire control of PASCO's business, Susquehanna failed to describe its plans or proposals relating to the disposition of PASCO's assets."

4. 14D filed December 3, 1968, contains an identical subsection (b) referred to in the December 2, 1968 Press Release above.

12. In the Amendment Complaint (paragraph 8(b)) filed in the Massachusetts Federal Court, PASCO alleged that Susquehanna's Schedule 13D statement is deficient and does not comply with Section

erly be contended that PASCO was misled by Susquehanna into an understanding that appellants would not seek control of PASCO and attempt to elect a Board majority at the annual stockholders' meeting in 1969. Such an understanding runs contrary to the plain wording of Susquehanna's Items 4 and 6 in its Schedule 13D statements. It is also contrary to PASCO's own understanding of Susquehanna's intentions as specifically declared in its Schedule 14D statements and its pleadings and statements of counsel in the Massachusetts Federal Court action. We cannot agree, therefore, that Susquehanna first evidenced its intention, on February 20, 1969, to control the PASCO Board when three Susquehanna designees were elected to the Board. PASCO's President knew from a meeting with Susquehanna's President on October 30, 1968 that the latter "had predicated his first statement [concerning the tender offer] with the fact he would be able to take control of our company."

■ Susquehanna's statement in Item 6 of Schedule 13D, that if it acquires 1,800,000 shares it expects to request the Pan American Board of Directors to fill the two vacancies now existing with Susquehanna's designees, should not be construed to mean that it thereby would forego its right by virtue of ownership of 42 per cent of the outstanding shares of stock to elect a majority of the Board at the forthcoming 1969 annual shareholders' meeting. All that was intended and achieved by the Item 6 statement was a filling of vacancies on PASCO's Board of Susquehanna's designees until the annual shareholders' meeting could be regularly held. The District Court's finding that there is a reasonable prob-

ability that PASCO would prevail in asserting misrepresentations by Susquehanna as to its intention to take over control of PASCO's Board is not borne out by the record, is clearly erroneous and must be reversed. Rule 52(a), Fed.R. Civ.P.

2) Susquehanna did not disclose in its Schedule 13D statements that it intended to merge PASCO with American Smelting and Refining Company (ASARCO), or some other corporation.

PASCO maintains that Susquehanna's Schedule 13D, Item 4, statements are false and misleading, especially that part which states that "Susquehanna does not plan or propose to liquidate Pan American, to sell its assets to, or merge it with, any other person, or to make any other major change in its business or corporate structure." This statement, reaffirmed by Susquehanna in all of the amended Schedule 13D statements, including that of December 9, 1968, cannot be reconciled, argues PASCO, with the action of Susquehanna's President in sending the telegram of December 10, 1968 proposing a PASCO–ASARCO merger. Before the telegram was sent, the idea for such a merger was discussed by Susquehanna's President with PASCO's President. The telegram was a unilateral offer to negotiate, was not sent pursuant to action by Susquehanna's Board, receipt was never even acknowledged by ASARCO, and two days later on Decemebr 12, 1968, PASCO denied that it authorized the proposal.

■ It would have been misleading to the stockholders and to the public investor for Susquehanna's Schedule 13D,

---

14(d) (1) of the Act in that it does not include the following:

"(b) A full and complete disclosure as required by Item 4 of the Schedule 13D statement in that, while disclosing that the purpose of said tender offer was to acquire control of PASCO's business, SUSQUEHANNA wholly failed to describe its plans or proposals relating to the disposition of PASCO's cash as-

set (being one (1) of its two (2) principal assets as referred to in Paragraph 4 hereof) as described in Paragraph 8(a) hereinabove. SUSQUEHANNA's nondisclosure in this regard also amounts to a failure to describe a major change in PASCO's business or corporate structure as is also required by Item 4 of the Schedule 13D statement."

Item 4 answer, including that filed December 9, 1968, to indicate that there was a plan or proposal to merge PASCO with ASARCO. The idea for such a merger never got off the ground. It subsisted for a mere two days when PASCO's management repudiated it. It was not a plan or proposal required to be included in the Schedule 13D statements.

Not enough emphasis has been given to that part of Susquehanna's 13D, Item 4, statement wherein Susquehanna said, "However, if, at some subsequent time, it should appear the interests of the Pan American stockholders would be better served by any of the foregoing courses of action, Susquehanna may propose or adopt such course." It should be obvious to even the uninitiated that when a corporation takes over control of another corporation having $60,000,000 in cash assets, some kind of change in the latter's business or corporate structure will likely occur some time in the future. Susquehanna provided for this possibility by that portion of its Item 4 response above quoted.

The legislative history of the new tender offer provisions of the Act (see H.R. Rep. No. 1711 in 1968 U.S.Code Cong. and Adm.News, pp. 2811–2823) traces the background and need of such legislation. The House Report states, "The cash tender offer has become an increasingly favored method of acquiring control of publicly held corporations." *Id.* at 2811. The failure of prior law "to provide adequate disclosure to investors in connection with a cash takeover bid" was one of the principal reasons for enactment of the new statutory provisions. *Id.* at 2812. The House Report further states: "The bill avoids tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid. It is designed to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case." *Id.* at 2813.

The House Report recites that "The cash tender offer is similar to a proxy contest," and observes that "The persons seeking control, however, have information about themselves and about their plans which, if known to investors, might substantially change the assumptions on which the market price is based. This bill is designed to make the relevant facts known so that shareholders have a fair opportunity to make their decision." *Id.* at 2813.

According to the House Report, proposed subsection 14(e) of the Act would prohibit any misstatement or omission of a material fact in connection with a tender offer and would affirm the obligation of the offeror "to make full disclosure of material information to those with whom they deal." *Id.* at 2821. Emphasis in the legislative history is, therefore, on full and fair disclosure by the offeror.

█ The person or corporation filing a Schedule 13D statement need not necessarily walk a tortuous path. He must, of course, be precise and forthright in making full and fair disclosure as to all material facts called for by the various items of the schedule. At the same time he must be careful not to delineate extravagantly or to enlarge beyond reasonable bounds. The securities market is delicately arranged and needs only slight impetus to upset it. As Judge Friendly has pointed out in the only other appellate court decision thus far involving the new tender offer provisions of the Act, "It would be as serious an infringement of these [SEC] regulations to overstate the definiteness of the plans as to understate them." Electronic Specialty Co. v. International Controls Corp., 2 Cir., 1969, 409 F.2d 937, 948. Judge Friendly finds that the congressional standard of disclosure is one requiring "basic honesty and fair dealing" by the offeror. *Id.* at 948. In the cited case the Second Circuit rejected an attack against the offeror's Schedule 13D statements, Judge Friendly observing, "Probably there will no more be a perfect tender offer than a perfect trial." *Id.* at 948. Though the offeror has an obligation fairly to disclose its plans in the event

of a takeover, it is not required to make predictions of future behavior, however tentatively phrased, which may cause the offeree or the public investor to rely on them unjustifiably. See Note, Cash Tender Offers, 83 Harv.L.Rev. 377, 394, 395 (1969). Target companies must not be provided the opportunity to use the future plans provision as a tool for dilatory litigation. 83 Harv.L.Rev. at 394.

Here the target corporation assails alleged false and misleading omissions and statements of the offeror. The next case may well be one in which exaggeration and overstatement is the basis of attack. We do not approve either understatement or extravagance. A sensible middle course is the proper one.

We have carefully examined Susquehanna's Schedule 13D statements in light of the legislative history and observations made above. In our view they are basically fair and complete under the circumstances presented in this case and comply with the Act and SEC rules and regulations.[13]

 The judgment of the District Court must, therefore, be reversed as clearly erroneous. Considering the nature of the case, and that the present record is complete following a lengthy trial, we determine that further proceedings in the District Court are not required. Kosty v. Lewis, 1963, 115 U.S.App.D.C. 343, 319 F.2d 744, 749. We are empow-

ered under 28 U.S.C. § 2106 in the exercise of a broad discretion to order dismissal of the complaint. We conclude that proper disposition, therefore, is not simply to reverse the injunction granted by the District Court but also to direct dismissal of the suit. Electronic Specialty Co. v. International Controls Corp., 2 Cir., 1969, 409 F.2d 937, 952.[14]

Reversed, with directions to dismiss plaintiffs' complaint.

---

13. Appellees have furnished the Court with a copy of the report of the SEC hearing examiner dated August 5, 1969, which concludes that Susquehanna's Item 4 statement was false and misleading in a material respect in connection with the planned use of the cash assets of PASCO and that the intentions of Susquehanna's President "had transcended the vague and amorphous status." Suffice it to say we are not bound in any way by these findings, nor do we agree with them. Thus far they have not been acted upon by the Commission itself.

In disposing of the case we have considered the evidence concerning Susquehanna's discussions with Los Angeles Banker Andrews, the telephone message of Susquehanna's President to ASARCO's President relative to a merger of an un-

named company later said by Susquehanna's President to be Hecla, and of course the circumstances attendant to the December 12 telegram to ASARCO. We are not convinced that Susquehanna's intentions in the event of obtaining control of PASCO required more than it stated in Item 4, Schedule 13D.

14. See the following additional cases cited to the text in Electronic Specialty Co. v. International Controls Corp., supra: Metropolitan Water Co. v. Kaw Valley Drainage District, 223 U.S. 519, 523, 32 S.Ct. 246, 56 L.Ed. 533 (1912); Guardian Trust Co. v. Kansas City Southern Ry., 8 Cir., 1909, 171 F. 43, 51; Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp., 2 Cir., 1962, 308 F.2d 196, 200; Zentner v. American Federation of Musicians, 2 Cir., 1965, 343 F.2d 758.