# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 8, 2009

Charles R. Fulbruge III
Clerk

No. 08-10414

FLAHERTY & CRUMRINE PREFERRED INCOME FUND
INCORPORATED; FLAHERTY & CRUMRINE PREFERRED INCOME
OPPORTUNITY FUND INCORPORATED; FLAHERTY &
CRUMRINE/CLAYMORE PREFERRED SECURITIES INCOME FUND
INCORPORATED; STAN HAIDUK

Plaintiffs-Appellants

v.

TXU CORP.; C. JOHN WILDER

Defendants-Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before KING, BENAVIDES, and CLEMENT, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

Appellants, Flaherty & Crumrine Preferred Income Fund, Inc.; Flaherty
& Crumrine Preferred Income Opportunity Fund, Inc.; Flaherty &
Crumrine/Claymore Preferred Securities Income Fund, Inc. (collectively, "F&C");
and Stan Haiduk ("Haiduk"), filed a securities fraud class action and individual
fraud claims against Appellees TXU Corporation ("TXU") and its former CEO
John Wilder ("Wilder") for allegedly making material misrepresentations and
omissions of fact in connection with a self-tender offer to purchase certain

convertible TXU securities (the "tender offer") in 2004. Specifically, Appellants alleged that Appellees fraudulently misrepresented the timing and magnitude of a planned stock repurchase program and dividend increase in order to induce the Appellants to participate in the tender offer. The district court dismissed Appellants' fraud claims alleged under Sections 10(b) and 14(e) of the Securities Exchange Act and SEC Rule 10b-5, as well as Appellants' common law fraud claims, for failure to state a claim under the heightened pleading standards applicable to securities fraud claims. We affirm the judgment of the district court.

I.

Appellants are three investment funds (F&C) and an individual plaintiff (Haiduk), all of whom owned convertible TXU securities called TXU Corporate Units (the "Corporate Units") and TXU Income PRIDES (the "PRIDES"). Both classes of securities were traded on the New York Stock Exchange and were convertible into TXU common stock.

Prior to the tender offer, Wilder, TXU's CEO, had implemented a three-phase restructuring program aimed at improving TXU's business. On May 18, 2004, approximately four months before the tender offer, TXU issued a press release outlining its view of the company's financial restructuring program. The press release indicated that TXU did not anticipate a dividend increase until 2006, when certain financial benchmarks were reached, but noted that TXU's Board of Directors (the "Board") might consider other relevant factors in determining when or if to authorize a dividend increase:

> Upon reaching the targeted balance sheet strength and financial flexibility, management would recommend that the Board of Directors reevaluate the current dividend policy. At that time, management expects it would recommend targeting annual common stock dividends equal to a pay out of 100 percent of the earnings of TXU's electric delivery business. Of the free cash flow, management would expect to return roughly 80 percent to shareholders in the

form of distributions or repurchases and to retain roughly 20 percent for long term growth initiatives. Assuming the execution of the business initiatives and transactions described above, and depending on market trends in commodity prices, management expects that this capital allocation program will enable management to recommend an increase of the dividend in 2006. In addition to management's recommendation, the Board of Directors may consider other relevant factors in determining if and when to make a change in the dividend policy.

On September 15, 2004, TXU announced that it was offering to purchase up to 11,433,285 outstanding Corporate Units and up to 8,700,000 outstanding PRIDES. Appellants collectively held 530,000 Corporate Units and 5,000 PRIDES prior to the tender offer. Investors holding the outstanding securities had the option to tender their securities to TXU or retain them, and Appellants were among the roughly 65% of investors who accepted the tender offer and sold their securities back to TXU. The price offered for the securities in the tender offer was $52.28 for each Corporate Unit and $52.39 for each PRIDE. The tender offer purchase price was determined by applying a factor to the twenty-day weighted average price of TXU common stock between September 20, 2004, and October 8, 2004. The tender price was higher than the market price for the securities at the time of the tender offer. The offer itself (as well as forms filed with the SEC and the associated press release) contained the following language concerning the dividend policy:

> TXU Corp.'s debt and capital management program is intended to strengthen TXU Corp.'s balance sheet and financial flexibility. As a part of its capital management and restructuring program and considering current business and market conditions, TXU Corp.'s management is evaluating whether it should recommend to the TXU Corp. Board of Directors that they reevaluate TXU Corp.'s current common stock dividend policy. TXU Corp. cannot predict the outcome of management's evaluation, when, if at all, management would make a recommendation to the Board of Directors to change the current common stock dividend policy, or

3

> what management's recommendation might be. In addition to any recommendation from management, the Board of Directors may consider other relevant factors in determining if and when to make a change in TXU Corp.'s common stock dividend policy.

TXU also announced its intent to repurchase up to 10 million shares of its common stock, subject to market conditions and other factors. On September 28, 2004, CEO Wilder made a presentation in which he reiterated previous representations that the dividend policy was under review and discussed TXU's capital allocation and growth strategy.

On October 12, 2004, just one day before the expiration of the offer, TXU management gave a detailed financial plan to certain credit rating agencies for the purpose of facilitating the agencies' determinations of whether an increase in TXU's annual dividend would adversely affect the corporation's credit rating. On October 13, 2004, the final day of the tender offer, F&C tendered 425,000 of its 525,000 Corporate Units to TXU for total proceeds of $22,219,000, and Haiduk tendered 5,000 Corporate Units for total proceeds of $260,093.89 and 5,000 PRIDES for total proceeds of $261,103.88.

On October 19, 2004, six days after the end of the tender offer period, TXU management provided materials to the Board proposing a change in dividend policy, and on October 21, 2004, management recommended a 350% increase of the annual dividend on common stock and a 400% increase in the stock repurchase program. In the interim between management's provision of the materials to the Board and the final recommendation, TXU management received final reports from the credit rating agencies informing the corporation that an increase in dividend payouts would not adversely affect its credit rating. On October 22, 2004, the Board approved the dividend increase and the stock repurchase program. On October 25, 2004, TXU publicly announced its plan to increase the common stock dividend from $0.50 to $2.25 and to repurchase

approximately 50 million shares of TXU common stock. Immediately following the announcement, the per-share value of TXU common stock jumped nearly 20%. The Corporate Units and the PRIDES experienced correlated increases in value.

On, September 6, 2005, Appellants filed their original class action complaint in the district court, alleging that the Appellees violated federal securities laws and intentionally defrauded Appellants and other similarly situated holders of TXU securities by failing to inform those who participated in the tender offer that a dividend increase and increased stock repurchase was imminent. Appellants' essential theory is that TXU and Wilder failed to inform them of the impending dividend increase in order to induce Appellants to participate in the tender offer before the value of their securities increased. Appellants alleged three causes of action for fraud under the Securities Exchange Act: (1) a violation of Section 14(e)[1]; (2) a violation of Section 10(b)[2]

---

[1] Section 14(e) of the Securities Exchange Act makes it unlawful:

> for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

15 U.S.C. § 78n(e).

[2] Section 10(b) of the Exchange Act provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

and Rule 10b-5[3]; and (3) controlling person liability against Wilder under Section 20(a).[4] Appellees filed a motion to dismiss all of the Appellants' claims on December 16, 2005, which was granted by the district court. Appellants appealed to this court, but while the appeal was pending, the United States Supreme Court issued its decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S. Ct. 2499 (2007), which clarified the pleading standard for scienter under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). In response to the *Tellabs* decision, and without addressing the merits of the appeal, this court vacated the district court's judgment and remanded the case for further consideration in light of *Tellabs. Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.,* 242 F. App'x 253 (5th Cir. 2007).

Appellants filed a second amended complaint on November 26, 2007, restating their original claims and supplementing the complaint with the expert report of Professor Linda Allen, Professor of Finance at the City University of New York, and additional instances of alleged fraudulent misrepresentations.

---

15 U.S.C. § 78j(b).

[3] SEC Rule 10b-5, promulgated pursuant to Section 10(b), provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

[4] Under Section 20(a), a person who exerts control over a person who violates any provision of the Securities Exchange Act can be held jointly and severally liable with the primary actor of the underlying securities law violation. 15 U.S.C. § 78t(a). Liability under §20(a) requires the primary actor to be liable for the underlying violation, and here is premised on the Section 10(b) or 14(e) violation.

Appellants also added individual non-class common law fraud claims under Texas state law. Appellees again filed a motion to dismiss Appellants' claims. The district court dismissed the Appellants' federal securities fraud claims on the pleadings under Rule 12(b)(6) because the pleadings failed to give rise to a strong inference of scienter under the standard articulated in *Tellabs* and dismissed their common law fraud claim for failure to plead fraud with particularity as required by Rule 9(b). The instant appeal followed.

## II.

A district court's dismissal of federal securities law claims under Rule 12(b)(6) is reviewed de novo. *Herrmann Holdings, Ltd. v. Lucent Tech. Inc.*, 302 F.3d 552, 557–58 (5th Cir. 2002); *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 550 (5th Cir. 2007). A dismissal for failure to state fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim, and is also reviewed de novo. *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 520 (5th Cir. 1993).

Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Rule 9(b) states that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This Circuit's precedent interprets Rule 9(b) strictly, requiring the plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997); *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 412 (5th Cir. 2001).

In order to state a claim for fraud under Section 10(b) and Rule 10b-5 of the Securities Exchange Act, a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or an omission (2) of a material fact (3) made with scienter (4) on which the plaintiffs relied (5) that proximately caused the plaintiff's injury. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005). The elements of a claim under Section 14(e), which applies to tender offers, are identical to the Section 10(b)/Rule 10b-5 elements. *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 605 (5th Cir. 1974).

The Private Securities Litigation Reform Act ("PSLRA"), which governs federal securities fraud claims, requires that a plaintiff in a securities fraud case must, for "each act or omission alleged" to be false or misleading, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see also Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008); *Zonagen*, 267 F.3d at 407 ("[A] plaintiff alleging a section 10(b)/Rule 10b-5 claim must now plead specific facts giving rise to a strong inference of scienter." (citations omitted)). The PSLRA also incorporates the Rule 9(b) requirements into the pleading standard for federal securities fraud claims. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 431 (5th Cir. 2002). Under the PSLRA, the court considers whether all the facts and circumstances, taken together, give rise to a strong inference of scienter. *Id.*; *Zonagen*, 267 F.3d at 425.

Scienter, in the context of securities fraud, is defined as "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs.*, 401 F.3d at 643; *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir. 2005) ("[A] securities fraud plaintiff must prove that the defendant either consciously misbehaved . . . or was so severely reckless that it demonstrates that the

defendant must have been aware of the danger of misleading the investing public."). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *R2 Invs.*, 401 F.3d at 643 (quotation omitted). In *Tellabs*, the Supreme Court clarified the standard for pleading a "strong inference" of scienter. *Tellabs*, 127 S. Ct. at 2509–10. This Circuit has recently interpreted *Tellab*s as requiring a "three step approach to reviewing scienter allegations on a motion to dismiss a federal securities fraud case pursuant to the PSLRA":

> First, the allegations must, as in federal pleadings generally, be taken as true. Second, courts may consider documents incorporated in the complaint by reference and matters subject to judicial notice. The facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pled. Third, a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. The inference of scienter must ultimately be "cogent and compelling," not merely "reasonable" or "permissible."

*Ind. Elec.*, 537 F.3d at 533 (citing *Tellabs*, 127 S. Ct. at 2509–10). In addition, "omissions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Tellabs*, 127 S. Ct. at 2511 (citation omitted).

Although we have stated that allegations of motive and opportunity standing alone will not suffice to meet the scienter requirement, motive and opportunity allegations may meaningfully enhance the strength of the inference of scienter. *Ind. Elec.,* 537 F.3d at 533 (citing *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 368 (5th Cir. 2004)). We have rejected the group pleading approach to scienter and instead look to the state of mind of the individual corporate official or officials "who make or issue the statement (or

order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Id*.

### III.

Appellants point to several statements made by either TXU or Wilder which they assert violate federal securities laws. For each of these statements, we must evaluate the scienter allegations pertinent to each and determine whether the facts, evaluated collectively, support a "cogent and compelling" inference that Appellees acted with intent to deceive, manipulate, or defraud or acted with severe recklessness. *See Ind. Elec.*, 537 F.3d at 533–34. In evaluating whether scienter has been established, we will consider the complaint, documents incorporated in the complaint by reference, and matters subject to judicial notice. *Id*. This evaluation must take into account plausible inferences opposing as well as supporting a strong inference of scienter. *Id*.

Appellants urge that, in accepting the tender offer, they relied on the representation originally stated in TXU's May 2004 press release indicating that TXU did not anticipate a dividend increase until 2006, when certain financial benchmarks were reached. Appellants do not clearly delineate between whether they allege an affirmative misrepresentation or an omission. In their second amended complaint, Appellants pointed to various statements made after the May 2004 press release which they allege do not contain a sufficient disclosure of the impending dividend increase or affirmatively misstate that no dividend increase will occur until after certain financial benchmarks are reached.

The first of these statements, issued in the tender offer materials on September 15, 2004, stated:

> As a part of its capital management and restructuring program and considering current business and market conditions, TXU Corp.'s

10

management is evaluating whether it should recommend to the TXU Corp. Board of Directors that they reevaluate TXU Corp.'s current common stock dividend policy. TXU Corp. cannot predict the outcome of management's evaluation, when, if at all, management would make a recommendation to the Board of Directors to change the current common stock dividend policy, or what management's recommendation might be. In addition to any recommendation from management, the Board of Directors may consider other relevant factors in determining if and when to make a change in TXU Corp.'s common stock dividend policy.

Appellants contend that this statement is misleading because, although it does state that the dividend policy is under review, it does not sufficiently disclose the alleged "steps taken to increase the TXU dividend" upon completion of the tender offer.

The second statement that Appellants point to was made by Wilder at the Merrill Lynch Global Power & Gas Leaders Conference on September 28, 2004, during the tender offer period.[5] Wilder presented a power point presentation, which included a slide that described TXU's capital allocation policy. The slide stated that the "dividend payout" was "under review." The statement concerning the dividend payout was contained in a flow chart and was preceded by a statement that "debt reduction" was to continue until certain financial goals had been met. An arrow pointing toward the "dividend payout" section flowed from the "debt reduction" section of the chart. Appellants contend that this flow chart indicated that the "dividend payout" step would not take place until the "debt reduction" goals had been met. Appellants contend that at the time Wilder made this statement, he knew (1) that the financial benchmarks would not be met before the dividend was increased and (2) that significant steps had been taken to increase the dividend which were not communicated sufficiently by the

---

[5] This presentation was incorporated into a Form 8-K filed with the SEC on September 28, 2004.

statement that the dividend policy was "under review." Appellants also contend that Appellees' failure to "retract" the May 2004 statement concerning the dividend policy violated federal securities' laws.

In addition to the facts pleaded in the their complaint, Appellants reference statements made in a January 18, 2005 letter (appended to their complaint) written by then TXU Associate General Counsel David Poole (the "Poole letter")[6] and conclusions in an expert report prepared by Professor Linda Allen (the "Allen Report") which Appellants claim provides evidence that at the time of the tender offer, Appellees were fully aware of the impending dividend increase.

In the Poole letter, TXU's counsel stated that management had been contemplating a change in dividend policy since August 2004, but did not make a final decision until after the close of the tender offer on October 13. The Poole letter also asserted that TXU's management would not make a decision concerning the dividend policy until they had received information from certain credit rating agencies, evaluating the impact of changes in dividend policy and capitalization on the credit ratings of debt securities of TXU Corp. and its subsidiaries. Appellants contend that this explanation, advanced here by the Appellees, is implausible, pointing to conclusions made in the Allen Report. By comparing the TXU restructuring and dividend policy changes with those of other companies and evaluating the dates put forth in the Poole letter, the Allen Report concludes that—despite the fact that the agencies had not given any official evaluation of the dividend increase—TXU senior management likely

---

[6] Appellants contend that the statements in the Poole letter should not be considered when evaluating opposing inferences. Appellants fail to acknowledge that because they attached the letter to their complaint (not to mention referenced the letter in the report of their own expert), it is relevant for the purposes of evaluating a motion to dismiss. *See Tellabs*, 127 S. Ct. at 2509 (stating that, in the context of a motion to dismiss, courts may consider documents incorporated in the complaint by reference when evaluating whether scienter has been established).

already knew during the tender offer period that the credit rating agencies would not downgrade its issuer rating based on the common share dividend increase. The Allen Report also concludes, based on Allen's evaluation of the general credit rating process of major credit rating agencies, that the credit agency review could not be completed between October 12, 2004 (the date on which Appellees furnished the credit agencies with paperwork concerning the proposed dividend increase) and October 19, 2004, two days before management recommended the increase.

Although the timing of the dividend increase, which was recommended by TXU management just eight days after the close of the tender offer, is suspect, Appellants have not provided facts sufficient to support a "cogent and compelling" inference that Appellees made any statements intentionally or recklessly to mislead TXU's investors. In fact, it is not clear that Appellees ever issued a materially misleading statement or omission of fact concerning the dividend policy. The close proximity of the dividend increase to the end of the tender offer, though it provides some support for an inference of scienter, is not sufficient, without more, to establish a strong inference of the requisite intent. *See In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 555–56 (D. Del. 2002), aff'd, 357 F.3d 322 (3d Cir. 2004) (holding that the fact that the offeror company disclosed two successful transactions within weeks after tender offer was completed does not establish that company had knowledge of these transactions at time tender offer was made).

Appellants contend that they relied on the May 2004 press release which stated that a dividend increase was not likely until 2006 when certain financial benchmarks had been made, but reserved the right of the management to consider other factors in determining if and when to change the dividend policy. Appellants have not presented any evidence of scienter with regard to this statement. There is no evidence that at the time this statement was made in

13

May 2004, TXU management, specifically Wilder, was aware or should have been aware that TXU planned to increase the dividend prior to the financial benchmarks being reached.

The second statement pointed to by Appellants, made at the start of the tender offer period, was that the dividend policy was "under review." Appellants contend that this statement was made to mislead investors because at the time it was made, substantial steps had been taken toward a dividend increase which warranted a more substantial disclosure or a "retraction" of the May 2004 press release statements. Again, Appellants' evidence does not support a strong inference that, on the date this statement was issued, Appellees knew and were at least reckless in failing to disclose that there was an impending dividend increase. Although the Allen Report provides some support for the notion that TXU's management likely made preparations for the dividend increase before the close of the tender offer, such preparations do not support a cogent and compelling inference that Wilder or other TXU management were intentionally or recklessly misleading investors. In fact, the statement that the dividend policy was "under review" conveyed that TXU had taken some steps in evaluating a change in the dividend policy.

The precedent of this court does not support the notion that TXU's disclosure that its policy was "under review" was insufficient, let alone fraudulent, under federal securities laws. TXU had disclosed that its dividend policy was "under review," but that it could not predict if, or when, management would ultimately recommend a dividend increase. TXU management did not recommend the dividend increase until sometime after October 19, 2004 and the Board did not actually approve a dividend increase until October 22, 2004. Both of these dates fell after the expiration of tender offer on October 13, 2004. This court's precedent advises that a "middle course" is proper when making disclosures concerning future plans which have not been fully determined in the

context of a tender offer. *Susquehanna Corp. v. Pan Am. Sulphur Co.*, 423 F.2d 1075, 1085–86 (5th Cir. 1970) (holding that a tender offeror "is not required to make predictions of future behavior, however tentatively phrased, which may cause the offeree or the public investor to rely on them unjustifiably"). TXU could not have disclosed that a dividend increase was likely during the tender offer without running a risk of liability if the dividend increase was not ultimately approved. *See id.* The statement that the dividend policy was "under review" appears to be a statement that, although vague, accurately represents the state of the dividend policy during the tender offer period. Furthermore, given that the May 2004 press release stated that the Board could consider factors other than the outlined financial benchmarks when determining whether to change the dividend policy, the statement in the tender offer materials that the dividend policy was currently "under review" was entirely consistent with the press release, and obviated the need to retract the May 2004 representations.

The statement made by Wilder during his presentation provides a closer question as to whether the Appellants have established scienter. Appellants contend that Wilder's presentation reiterated the structure stated in the May 2004 press release, conveying that a dividend increase was contingent upon the completion of certain financial benchmarks. In order to satisfy the scienter requirement, Appellants must establish that Wilder made this representation knowingly or recklessly in order to mislead investors.

In the first instance, there is a question as to whether Wilder's presentation was a misstatement. Although the phrase "dividend payout" is contained in a flow chart which is preceded by the "debt reduction" step, the dividend payout step does affirmatively state that it is presently "under review,"

15

consistent with TXU's prior disclosures.[7] Even assuming that the presentation was a misleading statement concerning the dividend policy, Appellants have not provided evidence to support a strong inference of scienter. Appellants again point to the Allen report, which provides some circumstantial evidence that Wilder may have known at the time of the presentation that a dividend increase was imminent. Appellants also point to Wilder's position in TXU, and assert that as CEO he must have been present during Board discussions of a possible dividend increase. Appellants also contend that because Wilder was a TXU stockholder, he stood to benefit from the repurchase of Appellants' securities at a low price. This court, in applying *Tellabs* and the pleading standards of the PSLRA, has discounted similar types of evidence against company executives as insufficient to establish scienter. *Ind. Elec.*, 537 F.3d at 535 (holding that "pleading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company"); *see also id.* at 543–44 (holding that monetary rewards for executives tied to company performance are standard and "can hardly be the basis on which an allegation of fraud is predicated").

Even assuming Wilder was aware that the Board was contemplating a dividend increase, this knowledge alone would not suffice to establish that Wilder intended to deceive investors or was reckless in revealing only that the dividend policy was under review at the time of the tender offer. *Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 889 (5th Cir.1987) (holding that "knowledge of omitted facts does not itself establish scienter"). These motive allegations, in conjunction with the conclusions of the Allen report and the timing of the dividend increase, provide a basis for some inference of fraud, but

---

[7] In addition, the chart does not ever explicitly state that the various steps are dependent upon one another such that the dividend policy could not be evaluated until the other capital allocation goals had been achieved.

this inference is merely permissible, and does not rise to the "cogent and compelling" level required by *Tellabs*. Even if Wilder was negligent in representing that the dividend payout was contingent upon the completion of certain debt reduction goals, negligence does not suffice for scienter purposes. *Ind. Elec.*, 537 F.3d at 533 (noting that "simple or even inexcusable negligence" does not constitute the requisite state of mind for a federal securities case).

Furthermore, as this court stated in *Indiana Electric*, under *Tellabs*, we are obligated to consider inferences opposing the allegations of fraud. *Id.* Here, it can be inferred that Appellees had not made a final decision concerning a change in the dividend policy during the tender offer period, and were thus truthfully stating that the policy was under review. This constitutes a plausible nonculpable explanation of Appellees' actions. The credit rating agencies' evaluation of the proposed dividend increase—according to the dates in the Poole letter, which was appended to Appellants complaint, and the dates referenced in Appellants' expert report—was not furnished to TXU until after the end of the tender offer period. In addition, TXU management did not recommend a dividend increase, nor did the Board approve one, until after the close of the tender offer. Given that TXU and Wilder did disclose that the dividend policy was "under review" during the tender offer period, the inference of non-fraudulent intent weighs in favor of the Appellees. Although it is a close question, the facts alleged support at most only a permissible inference of scienter. Taking into account all of the facts in the aggregate, as well as inferences opposing fraudulent intent, Appellants have failed to raise a strong inference that TXU, and specifically Wilder, acted with the intent to deceive, manipulate, or defraud or acted with severe recklessness in making statements concerning the dividend policy.[8]

---

[8] Appellants' claim against Wilder as a controlling person under Section 20(a) of the Securities Exchange Act of 1934 "is secondary only and cannot exist in the absence of a

17

IV.

Appellants also alleged a claim for common law fraud under Texas law in their amended complaint. The common law fraud claim was based on the same alleged representations and/or omissions underlying Appellants' federal securities claims. The elements of common law fraud under Texas law are (1) a material misrepresentation; (2) that is false; (3) made with knowledge of its falsity or recklessness as to its truth; (4) made with the intention that it should be acted upon by another party; (5) relied upon by the other party, and (6) causing injury. *Jag Media Holdings Inc. v. A.G. Edwards & Sons Inc.*, 387 F. Supp. 2d 691, 709 (S.D. Tex. 2004); *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001).

Appellants contend that the claim should not have been dismissed because the district court found that the second amended complaint adequately specifies with particularity which statements contain the alleged misrepresentation and omissions, when and where those statements were made, why the Appellants believe them to be misleading, and that the alleged misstatements and omissions were material to the decision to participate in the tender offer. Appellants contend that because common law fraud claims are not subject to the PSLRA scienter requirements, they have adequately pleaded fraud even if their pleading was deficient with regard to scienter under the PSLRA.

It is true that common law fraud claims are not subject to the heightened "strong inference" of scienter standard imposed by the PSLRA. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 341 (5th Cir. 2008). However, the claims are still subject to the pleading standard of Rule 9(b). *Id.* ("Although the PSLRA's stricter scienter requirement does not apply to state-law fraud claims,

---

primary violation." *Southland*, 365 F.3d at 383. Because we have found the pleadings of Sections 14(e), 10(b), and Rule 10b-5 liability inadequate, it must be dismissed.

Rule 9(b) nevertheless incorporates an element of scienter."). This court has stated, in the context of a state law securities fraud claim, that:

> In order to adequately plead fraudulent intent, 'a plaintiff must set forth specific facts to support an inference of fraud.' 'Alleged facts are sufficient to support such an inference if they either (1) show a defendant's motive to commit securities fraud or (2) identify circumstances that indicate conscious behavior on the part of the defendant.'

*Herrmann Holdings,* 302 F.3d at 565 (5th Cir. 2002) (quoting *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996)).

Appellants contend that TXU and Wilder had sufficient motive to fraudulently induce investors to participate in the tender offer by withholding information about the dividend increase—namely to complete the tender offer and increase the value of Wilder's personal stock holdings. However, this court has held that certain motives alleged, especially those universal to corporations and their officers, do not suffice to establish an inference of fraud under Rule 9(b). *Herrmann Holdings*, 302 F.3d at 565–66 (holding that allegations of delay in order to benefit therefrom were insufficient); *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994) (holding that alleged motive to successfully bring to fruition offerings and enhance the value of the securities at issue was insufficient to establish inference of fraud); *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (holding that motive to inflate stock price and value of defendants investments was insufficient to establish scienter under Rule 9(b)). In light of this court's precedent, the motive attributed to Appellees by Appellants—the desire to complete a financially successful tender offer—is insufficient to establish an inference of fraud under Rule 9(b).

In the alternative, the complaint also failed to plead specific facts demonstrating "conscious behavior," which according to our precedent employs an even "more stringent standard" than the motive requirement. *Lovelace,* 78

F.3d at 1018–19 & n.2. Appellants contend that Wilder was in a position that demonstrated close personal involvement with the alleged fraud sufficient to show that Wilder made any misrepresentation consciously. Appellants cite this court's opinion in *Dorsey*, in which we held that the defendants, by virtue of their places as president and director of two very small businesses employing a total of eight workers in which they ran all day-to-day operations, could be imputed with knowledge of the company's failure to make secured loans. 540 F.3d at 342–43. The factual situation here does not approximate that in *Dorsey*. There are no special circumstances that require an assumption of Wilder's fraudulent intent because of his place as CEO of TXU, a large company with a complex system of management and decision-making. The facts plead by Appellants do not demonstrate that Wilder made any conscious misrepresentation concerning the dividend policy. Because Appellants failed to adequately allege fraudulent intent as required by Rule 9(b), the district court did not err in dismissing the claim for common law fraud.

For the foregoing reasons, the judgment of the district court is AFFIRMED.