**MISSOURI PORTLAND CEMENT COMPANY, Appellant,**

v.

**H. K. PORTER COMPANY, INC., et al., Appellees.**

No. 75–1971.

United States Court of Appeals, Eighth Circuit.

Feb. 13, 1976.

Decided May 3, 1976.

Daniel F. Kolb, Davis, Polk & Wardwell, New York City, for appellant; Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., on brief.

Jim J. Shoemake, Guilfoil, Symington & Petzall, St. Louis, Mo., for appellees; Wachtell, Lipton, Rosen & Katz, New York City, on brief.

Before LAY, HEANEY and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

This appeal involving anti-fraud provisions of the federal securities laws requires a determination of whether the district court [1] abused its discretion in denying appellant's most recent request for a preliminary injunction to block a cash tender offer for 500,000 shares of its common stock. We have concluded that appellant has failed to establish the prerequisites for obtaining preliminary injunctive relief and accordingly affirm.

Appellant Missouri Portland Cement Company (Missouri), a publicly held corporation whose stock is listed on the New York Stock Exchange, is a manufacturer of portland cement, a binding agent which is mixed with sandstone or other aggregates to produce concrete. Appellee H. K. Porter Company, Inc. (Porter), a diversified industrial concern, is engaged in the manufacture of steel and fabricated metal products, electrical equipment, asbestos, rubber and other products. Appellees T. M. Evans and E. P. Evans are respectively the controlling shareholder and chairman of the board of Porter.

On November 6, 1975, Porter announced an offer to purchase 500,000 shares of Missouri common stock at $24 per share. Prior to making this offer, Porter had already acquired 371,464 shares of Missouri in a private transaction with Cargill, Inc. on August 28, 1975, and an additional 13,400 shares in the open market between August 28, 1975, and the announcement of the tender offer. At the time of the offer,

1. The Honorable Roy W. Harper, United States District Judge for the Eastern District of Missouri.

therefore, Porter sought by this purchase to obtain a total of 49.2% of the outstanding shares of Missouri.

On November 10, 1975, four days after the announcement of the tender offer, Missouri instigated this action in the district court before Judge Harper primarily alleging that the Porter offer was violative of the tender offer disclosure provisions of the Williams Act,[2] 15 U.S.C. §§ 78m(d), 78n(d), 78n(e). Missouri also alleged violations of sections 7 and 16 of the Clayton Act, 15 U.S.C. §§ 18 and 26, but later withdrew the antitrust ground as a basis for requesting injunctive relief. Essentially, Missouri requested that the tender offer should be enjoined; that any shares acquired by Porter prior to or pursuant to the offer should be divested; or that Porter should be enjoined from voting such shares. Following a hearing the district court granted a preliminary injunction on November 26, 1975, prohibiting the tender offer from proceeding as originally published. The district court found: (1) that Porter had made an untrue statement of a material fact when it stated that its purpose in acquiring 500,000 shares of Missouri's outstanding stock was to increase Porter's investment in Missouri and did not disclose its intent to become the controlling shareholder of Missouri; (2) reference to unpublished criteria of the New York Stock Exchange regarding listing of additional shares constituted a second untrue statement which was material; and (3) Porter's initial "tombstone" publications

and use of a 1974 mailing list for a 1975 tender offer were inadequate. However, Porter was allowed by the district court to correct any misleading statements in the original tender offer by publishing a revised offer.[3]

On December 1, 1975, Porter filed a motion in the district court which came before Judge James H. Meredith [4] requesting the court's approval of an amended tender offer. After a hearing on December 2, 1975, the court found that Porter's revised tender offer cured the misrepresentations found to have existed in its original offer. The district court then issued an order permitting Missouri shareholders who had tendered shares pursuant to the original and invalid offer to withdraw their tendered shares and to accept the new offer if they so desired. The court also ordered Missouri to furnish Porter a current Missouri shareholder list so that the new tender offer, including a transmittal letter authorizing withdrawal from the original offer, could be mailed to all stockholders of Missouri.

On December 8, 1975, however, Missouri filed an amended complaint in the district court before Judge Harper seeking injunctive relief and damages. Missouri's renewed request for a preliminary injunction against the revised offer was based on similar violations alleged with respect to the original tender offer. Specifically, Missouri alleged that in the revised offer: (1) Porter had falsely represented that Missouri shares might be delisted under published New

2. Act of July 29, 1968, Pub.L. No. 90–439, 82 Stat. 454, *amending* Securities Exchange Act §§ 12–14, 15 U.S.C. §§ 78*l*–78n. According to the committee reports:

> The [Williams Act] would correct the current gap in our securities laws by amending the Securities Exchange Act of 1934 to provide for full disclosure in connection with cash tender offers and other techniques for accumulating large blocks of equity securities of publicly held companies.

S.Rep. No. 550, 90th Cong., 1st Sess. 4 (1967); H.R.Rep. No. 1711, 90th Cong., 2d Sess. 4 (1968), U.S.Code Cong. & Admin.News 1968, pp. 2811, 2814. *See generally* Note, *The Developing Meaning of "Tender Offer" Under the Securities Exchange Act of 1934*, 86 Harv.L. Rev. 1250 (1973).

3. Simultaneously, the court found that contrary to Missouri's contentions Porter had not sought control of Missouri until sometime in late October or in the first week of November 1975 and that Porter had no present plans to liquidate or sell Missouri assets. Accordingly, the district court denied Missouri's claim that Porter had manipulated the price of the Missouri shares obtained in the open market by concealing its intention to obtain control of Missouri as early as August 1975 and further denied Missouri's contention that Porter had improperly refused to disclose a policy of liquidating assets of companies it acquires.

4. Judge Harper was unavoidably absent at the time in question.

York Stock Exchange requirements if Porter's tender offer were successful; (2) Porter had failed to disclose the more advantageous terms of a competing merger between Missouri and Chromalloy American Corporation (Chromalloy); and (3) Porter had misrepresented its intent to participate in the conduct of Missouri's business.[5] On December 18, 1975, the district court, the Honorable Roy W. Harper, after a hearing, held that Missouri had failed to demonstrate a showing of substantial probability of success, which is a prerequisite to preliminary injunctive relief.

On January 7, 1976, after filing this appeal, Missouri's motion for a stay was denied. Porter's revised tender offer was subsequently completed, and it elected to accept the more than 500,000 shares which were tendered. As a result, Porter obtained 553,900 shares of Missouri common stock, giving it a total of 52.1% of Missouri's outstanding stock. In this appeal, Missouri contends that the district court erred in failing to issue a preliminary injunction and reiterates the general allegation that Porter has committed several violations of the disclosure provisions of the Williams Act.

■ At the outset, it should be emphasized that we do not consider appellant's contentions on the merits. At oral argument appellant gave the assurance that it intends to present additional evidence before the district court and that additional discovery would be helpful. Consequently, we are only permitted to determine whether the district court's order denying preliminary injunctive relief constituted an abuse of discretion. *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834, 857 (1943); *Nebraska Dep't of Roads v. Tiemann,* 510 F.2d 446, 447 (8th Cir. 1975). In *Minnesota Bearing Co. v. White Motor*

*Corp.,* 470 F.2d 1323 (8th Cir. 1973), the court specifically identified the proper standard for obtaining preliminary injunctive relief:

> ■ In order to justify the issuance of a preliminary injunction by the trial court, the movant has the burden of showing:
> (1) substantial probability of success at trial by the moving party, and
> (2) irreparable injury to the moving party absent such issuance.

*Id.* at 1326. We consider the present appeal only in this very limited context.

## I. Probability of Success

### A. Delisting of Missouri Stock.

Appellant first contends that Porter committed a violation of section 14(e) of the Williams Act by disclosing in its amended tender offer the possibility that Missouri stock could be delisted under published criteria of the New York Stock Exchange.[6] *See* 15 U.S.C. § 78n(e). In both its original and revised tender offer, Porter included the following disclosure statement:

> Depending on the number of Shares tendered and purchased pursuant to this Offer, the Common Stock may no longer meet the requirements of the New York Stock Exchange for continued listing and may therefore be delisted. Published guidelines of the New York Stock Exchange indicate that the Exchange would consider delisting if the number of publicly held shares was less than 600,000 or if there were fewer than 1,200 holders of 100 or more shares (round lot holders) or if the market value of the publicly held shares did not exceed $5,000,000. At December 31, 1974, Missouri reported ap-

---

5. Missouri also alleged the following grounds upon which it does not rely on appeal:

 (1) In its revised tender offer, Porter had attempted to conceal the right of Missouri shareholders to withdraw shares tendered under the original offer;

 (2) In a letter sent by Porter to Missouri shareholders, Porter had not disclosed the terms of the district court's ruling on the original unlawful tender offer.

The district court ruled against Missouri on both claims.

6. In its original complaint Missouri successfully attacked Porter's disclosures concerning unpublished delisting criteria of the New York Stock Exchange. Porter's revised tender offer, however, deleted any reference to *unpublished* criteria.

proximately 5,449 record holders of Common Stock.

Correspondingly, the New York Stock Exchange published guidelines with respect to the continued listing of a company's securities indicate that the Exchange would consider delisting (1) if the number of publicly held shares is less than 600,000; (2) if there are fewer than 1,200 holders of 100 shares or more; or (3) if the market value of publicly held shares does not exceed $5,000,-000. The essence of appellant's contention is that the possibility of delisting is so remote as to constitute a materially misleading statement. Moreover, Missouri asserts that this disclosure wrongfully coerced its shareholders into tendering their shares by creating a fear of loss of liquidity and value which would result if delisting occurred. After the hearing on November 20, 1975, the district court found that delisting was a possibility and was "sufficiently appreciable to require disclosure."

■ The Williams Act, 15 U.S.C. §§ 78l–78n, is founded on the principle that full and fair disclosure of all material facts must be made in connection with all tender offers so that investors may have the benefit of all significant facts in making their investment decisions. *See, e. g., Ronson Corp. v. Liquifin Aktiengesellschaft*, 483 F.2d 846, 848 (3d Cir. 1973), *cert. denied*, 419 U.S. 870, 95 S.Ct. 129, 42 L.Ed.2d 108 (1974); *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 362–65 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). In particular, section 14(e) of the Act prohibits the making of any untrue statement of material fact or omission to state a material fact which renders a tender offer misleading. 15 U.S.C. § 78n(e). The applicable test for whether a misrepresentation is material is whether a reasonable investor might have considered information to be important in deciding whether to accept a tender offer. *See Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 251 (9th Cir. 1973). *See generally Mills v. Electric Autolite Co.*, 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593, 602 (1970); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849

(2d Cir. 1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 976, 22 L.Ed.2d 756 (1969). It is clear that a representation concerning delisting is of such importance as to be material. *See Sonesta International Hotels Corp. v. Wellington Associates, supra*, 483 F.2d at 251. The fundamental question in this particular case is whether the delisting disclosure made by Porter was a misrepresentation which rendered the tender offer misleading.

■ The record reveals that two of the three New York Stock Exchange listing criteria are inapplicable in the instant case. Thomas P. Luscher, general counsel for Porter, conceded that the number of publicly held Missouri shares would not be reduced below 600,000 if Porter acquired the 500,000 shares which it had offered to purchase. Similarly, Luscher admitted that the criterion that publicly held shares must exceed $5,000,000 was never really considered. In contrast, the remaining criterion for listing, while admittedly remote, was nevertheless considered by Porter as a possibility. The record indicates that approximately 80% of Missouri's 5,400 shareholders were holders of 200 to 250 shares or less. Accordingly, delisting of Missouri stock was a possibility since fewer than 1,200 holders of 100 shares could have remained if virtually all of the small shareholders in Missouri had tendered their shares in response to the Porter offer. In *Sonesta International Hotels Corp. v. Wellington Associates, supra*, 483 F.2d at 251–54, disclosure concerning the risk of delisting was required because the cumulative effect of a subsequent tender offer might have subjected the target company to delisting. In the instant case, delisting could conceivably have occurred even without the necessity of a cumulative effect from other tender offers. Consequently, appellant has not sustained its burden of showing a substantial probability that it would prevail in asserting misrepresentations by Porter as to the possibility of Missouri's stock being delisted.

### B. *Control.*

Appellant also asserts that Porter committed a violation of the Williams Act by

refusing to disclose its alleged intention to control Missouri. *See* 15 U.S.C. §§ 78m(d), 78n(d), 78n(e). Porter obtained its initial position in Missouri on August 28, 1975, when it acquired 371,464 common shares of Missouri from Cargill, Inc. in a private transaction.[7] Cargill's 371,464 shares constituted approximately 20.6% of Missouri's 1,800,435 outstanding shares. In order to comply with the Securities Exchange Act of 1934, Porter filed on August 28, 1975, a 13(d) schedule, an informational statement which must be submitted by any person acquiring more than 5% of a registered security. *See* 17 C.F.R. § 240.13d–1. The 13(d) statement in relevant part disclosed that:

> The purpose of the purchase of the shares of Capital Stock of Missouri, hereinafter described, is for investment. While Porter has no present intention to acquire control of the business of Missouri, Porter may make additional purchases of Missouri Capital Stock from time to time, and will report any such additional purchases by amendments to this Schedule 13D.

Between August 28, 1975, and October 29, 1975, Porter purchased an additional 13,400 shares of Missouri stock on the open market, and filed amendments to its 13(d) schedule indicating the purchases. None of the amendments, however, expressed an intention to acquire control of Missouri.

T. M. Evans also acquired from Cargill a list of Missouri shareholders, and this list was ultimately computerized by Porter in order that it might solicit shares of Missouri on a state-by-state basis. On October 2, 1975, Evans requested T. P. Luscher to begin preparation of blank tender offer forms. The board of directors of Porter on November 6, 1975, approved a proposed tender offer for 500,000 shares of Missouri at $24 per share. Acquisition of all 500,000 shares would have given Porter 49.2% of the outstanding Missouri stock. In connection with this tender offer, Porter filed another 13(d) statement expressing its tender offer.

On November 7, 1975, notices of the tender offer were mailed to Missouri shareholders. The tender offer was specified as running from November 7, 1975, until November 17, 1975, unless extended by Porter. In its tender offer, Porter indicated that the purpose of the proposed purchase of Missouri's common stock was "to increase Porter's investment in Missouri" and "this may give Porter effective working control of Missouri." The district court, as previously indicated, in its order of November 10, 1975, found that Porter had made an untrue statement of a material fact when it stated in its tender offer that its purpose in acquiring the 500,000 additional shares of Missouri's outstanding common stock was to increase Porter's investment in Missouri and did not disclose its intent to become the controlling shareholder of Missouri.

Subsequently, after a preliminary injunction was issued preventing the original tender offer from proceeding, Porter amended its tender offer and made additional and modified disclosures. The district court, in orders issued on December 2, 1975, and December 18, 1975, determined that Porter's duty to disclose its intention to control Missouri was met by the disclosures contained in the amended tender offer of December 9, 1975.

In this appeal, Missouri asserts, *inter alia*, that Porter formed an intent to control Missouri in late August 1975 which it concealed from the shareholders and thereby manipulated the stock market permitting Porter to purchase Missouri stock on the open market and pursuant to its tender offer at a price lower than real value.

The Williams Act requires the truthful disclosure of any corporate plans or proposals behind contemplated acquisitions of securities covered by the Act. 15 U.S.C. §§ 78n(d), 78n(e). *See, e. g., Susquehanna Corp. v. Pan American Sulphur Co.,* 423 F.2d 1075, 1079–84 (5th Cir. 1970). Certain tender offerers and owners of more than 5%

---

7. The background of Cargill's relationship with Missouri interestingly parallels that of Porter. *See Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 873 (2d Cir. 1974).

of a registered security must comply with the disclosure requirements of schedule 13(d), one of which is to state the purposes of a transaction. 17 C.F.R. § 240.14d–1(c)(4). *See* 15 U.S.C. § 78m(d). The federal regulations specifically state:

> If the purpose or one of the purposes of the purchase or proposed purchase is to acquire control of the business of the issuer, describe any plans or proposals which the purchasers may have to liquidate the issuer, to sell its assets or to merge it with any other persons, or to make any other major change in its business or corporate structure * * *.

17 C.F.R. § 240.13d–101(4). We must determine whether there is a substantial probability that Missouri would prevail in asserting misrepresentation by Porter as to its intention as early as August 1975 to gain control of Missouri. Because of the difficult factual question of when Porter actually formed the intention to acquire control of Missouri, we examine separately Porter's acquisitions of stock on the open market from the purchases executed pursuant to the tender offer.

### (1) Open Market Purchases

In its order of November 26, 1975, after a full hearing, the district court found that Porter did not attempt to acquire control of Missouri immediately after the Cargill purchase and that Porter did not actually seek to obtain control of Missouri until late in October or early November 1975. T. M. Evans testified at the hearing that Porter did not care to exercise control of Missouri because Porter did not have any expertise in the cement industry. Porter's purchases of Missouri stock were consistently categorized as an investment in a company with extensive land resources which would provide Porter with a solid hedge against inflation. In addition, Evans stressed that Missouri's bylaws provided for staggered elections and cumulative voting which would make control difficult to obtain in the short term. While these reasons support an "investment" motive on behalf of Porter during its open market purchases of Missouri stock, Porter's active pursuit of Missouri stock cannot be ignored. Porter began on August 28, 1975, with a substantial purchase from Cargill which provided a 21% interest in Missouri. Simultaneously, Porter requested and received from Cargill a Missouri shareholder list which was computerized so that additional shares could be obtained on a state-by-state basis. Furthermore, immediately after the Cargill purchase, Porter began actively buying Missouri stock on the open market and during the time from August until October, Porter's acquisitions constituted 65% of the market in Missouri stock sales. Although T. M. Evans testified that Porter did not form a definite interest in the Missouri tender offer until late October, T. P. Luscher stated that he was requested to prepare tender offer papers as early as October 2, 1975. These conflicting facts present a close question of whether the district court's finding that Porter did not form an intent to control Missouri until late October or early November of 1975 was clearly erroneous. In any event, we are not required to resolve the issue in this appeal. We conclude that appellant has not sustained its burden of showing that the shareholders who sold stock to Porter on the open market would suffer irreparable harm if preliminary injunctive relief is not granted. *See* part II, *infra.* Those persons who sold their stock at allegedly depressed prices have an adequate remedy at law by an action for damages. *See Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 60, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12, 21 (1975).

### (2) Tender Offer Purchases

The district court, in its order of December 18, 1975, also found that the disclosures relating to Porter's intention to obtain control over Missouri were not misrepresented in the revised tender offer. In pertinent part, Porter's revised tender offer, which was mailed to all Missouri stockholders, stated:

> In the event 500,000 Shares of Missouri's Common Stock are purchased hereunder Porter has no present plans or proposals to exercise day-to-day operating con-

trol of Missouri's business, to liquidate it, sell its assets, merge it with any other entity or make any other change in its business or corporate structure; nor does Porter presently have any intention to make any changes in Missouri's management or to seek representation on Missouri's Board of Directors. Because Missouri's By-Laws provide for a classified Board of Directors currently consisting of twelve directors, four of whom are elected for three-year terms at each annual meeting, and its Certificate of Incorporation provides for cumulative voting in the election of Directors, even if Porter acquires 500,000 Shares pursuant to this Offer and subsequently seeks Board representation, Porter might not be able to elect Board representation consistent with its stock position until the third annual meeting following this Offer unless Porter were to seek and obtain appropriate modification to Missouri's By-Laws so as to eliminate the classification of the Board of Directors. Porter has no present plan or intention to take any such action.

All Missouri shareholders were also informed by the express terms of the revised tender offer that the purpose of the proposed purchase was "to enable Porter to become the Controlling Shareholder of Missouri." It is clear that a defective tender offer can be cured by an amending offer. *See Ronson Corp. v. Liquifin Aktiengesellschaft*, 497 F.2d 394, 395 (3d Cir. 1974); *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 947 (2d Cir. 1969). We are not inclined on the present record to set aside the district court's finding that the revised tender offer, conceding that the purpose of the proposed purchase was to enable Porter to become the controlling shareholder but disavowing any intention to exercise day-to-day operating control of Missouri's business, constituted a sufficiently accurate statement of Porter's present intentions.

Furthermore, the record demonstrates that Missouri itself concluded that Porter's intentions were to gain control and in fact undertook to inform its stockholders to that effect. A letter mailed by M. Moss Alexander, Jr., chairman of the board at Missouri, recommended that Missouri shareholders reject the cash tender offer and expressly pointed out that Porter sought to gain control of Missouri.[8] In summary, the shareholders had published information in the tender offer that Porter sought control, Missouri's statement to the same effect, and Missouri's recommendation that the shareholders reject the tender offer. The shareholders and the public investor were fully informed of Porter's intention to control. *See Susquehanna Corp. v. Pan American Sulphur Co.*, 423 F.2d 1075, 1083 (5th Cir. 1970). Accordingly, there is substantial evidence to support the district court's conclusion that there is not a reasonable probability that Missouri would prevail on its allegation that Missouri shareholders were misled by Porter's disclosures relating to control in its amended tender offer.

### C. *Liquidation.*

Appellant further contends that Porter committed a violation of the Williams Act by failing to disclose Porter's alleged longstanding policy of liquidating companies. In its schedule 13(d) filing, Porter stated that it had no present intention to liquidate the assets of Missouri:

> Porter has no present plans or proposals to exercise day-to-day operating control of Missouri's business, to liquidate it, sell its assets, merge it with any other entity or make any other change in its business or corporate structure; nor does Porter have any intention to make any changes in Missouri's management.

The district court in its order of November 26, 1975, found that Porter had not formed any present intention to liquidate Missouri assets and determined that Porter's disclo-

---

**8.** The letter dated November 10, 1975, provided Missouri shareholders with ample time to avoid or withdraw from Porter's amended tender offer which was mailed on December 9, 1975, and remained in effect until December 16, 1975.

sure statement concerning liquidation was not a misrepresentation.

 A tender offer under the circumstances existing in this case must disclose the purpose underlying the purchase of securities, including any plans which the purchaser may have to liquidate the issuer or to sell its assets. *See* 15 U.S.C. §§ 78n(d), 78n(e); 17 C.F.R. § 240.13d–101(4). *See also* 15 U.S.C. § 78m(d). The record discloses that Porter previously had a reputation in the business community of acquiring control of various corporations and subsequently liquidating their unprofitable assets. T. M. Evans, however, testified that Porter had withdrawn from such a policy. He testified Porter's present policy is to invest in companies such as Missouri which own assets entrenched in land in order to provide for a hedge against inflation. Moreover, there is no evidence in the record to indicate any present intention of Porter to liquidate the assets of Missouri. We believe, therefore, there is substantial evidence to support the district court's finding that Porter had no present plans to liquidate Missouri or sell any of its assets.

 The district court did not rule explicitly on Missouri's allegation that Porter should have disclosed its *past policy* of liquidation. In any event, we do not believe there is a reasonable probability that Missouri will prevail in asserting it was a misrepresentation to fail to disclose such a past policy. A tender offerer is not obligated to disclose in schedule 13(d) a past policy to liquidate or sell the assets of the target company. *See* 17 C.F.R. § 240.13(d)–101(4). Nor is a failure to disclose such a past policy an omission of a material fact or a misleading statement under 15 U.S.C. § 78n(e). As the court in *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969), stated:

> Congress intended to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make the new statute a potent tool for incumbent management to protect its own interests against the desires and welfare of the stockholders.

These considerations bear on the kind of judgment to be applied in testing conduct—of both sides—and also on the issue of materiality.

We conclude that appellant has failed to sustain its burden of showing there is a reasonable probability that it could prevail on its claim relating to disclosure of past liquidation policy.

### D. *Proposed Merger.*

Finally, appellant asserts that Porter committed a violation of the Williams Act by failing to disclose the terms of the proposed merger of Missouri with Chromalloy. On November 24, 1975, Missouri announced that it had reached an agreement in principle on a merger of Missouri with Chromalloy. Missouri was offering the proposed Chromalloy merger as a more attractive alternative to Porter's tender offer. Simultaneously, Missouri announced the proposed merger in a press release and mailed a letter and a copy of the press release to all of its shareholders. In general, the correspondence stated that the merger would be more advantageous than the Porter offer and explained the proposed details of the merger. In its tender offer, Porter made reference to the proposed Missouri-Chromalloy merger, but Missouri claims the degree of detail used in those references is insufficient to satisfy the disclosure requirements of the Williams Act. The district court, however, held that Porter was not required to disclose the specific details of the merger because the proposed merger was tentative, conditional and inconclusive.

 Generally, a tender offerer must disclose any plan which the purchaser may have for a merger of the issuer with another company and any other major change in the business or corporate structure of the issuer must be stated. 15 U.S.C. §§ 78n(d), 78n(e). *See generally Susquehanna Corp. v. Pan American Sulphur Co., supra,* 423 F.2d at 1084–86. Even though the exact terms of the proposed merger were not specified in its tender offer of December 9, 1975, Porter did make reference to the proposed Missouri-Chromalloy merger as follows:

"Porter intends to exercise its right as a shareholder to oppose the proposed merger of Missouri into Chromalloy American Corporation." Furthermore, the Missouri shareholders were given explicit details of the proposed merger by the letter and press release mailed by the Missouri management on November 24, 1975. The Missouri shareholders were, therefore, fully advised on the subject of the merger regardless of any failure by Porter to fully disclose its proposed terms. *See Susquehanna Corp. v. Pan American Sulphur Co., supra,* 423 F.2d at 1082–86.

Nor are we convinced that it was necessarily the obligation of Porter to disclose the terms of a proposed merger to which it was not a party. For Porter to have disclosed the negotiation details of a merger proposal which was being discussed between Missouri and Chromalloy could have been misleading to Missouri's shareholders since it has not been shown that Porter had knowledge of the exact details of the proposal. *Cf. United States Smelting, Refining and Mining Co. v. Clevite Corp.,* [1969–1970 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 92,691 (N.D.Ohio 1968). Porter's obligations are distinguishable from the responsibility of corporate insiders such as a company's management or board of directors to disclose matters of which they have special knowledge.

▮▮▮ Moreover, we observe that the proposed merger apparently had not advanced beyond the stage of a tentative agreement. Parties are not required to disclose plans which are contingent or indefinite. *See Susquehanna Corp. v. Pan American Sulphur Co., supra,* 423 F.2d at 1084–86. In this connection, we note that the proposed merger agreement provided Missouri with the right to withdraw unless Chromal-

loy agreed to issue a stated number of shares. The proposed merger was a mere agreement in principle which made reference to a definitive agreement to "be adopted." Furthermore, the agreement enumerated numerous conditions necessary to the consummation of the transaction including negotiation, approval by the shareholders and directors, effectiveness of a registration statement, listing on the New York Stock Exchange, the absence of materially adverse changes in either company, and a complete investigation of the other party's business. The concluding provision of the agreement stated:

> This letter is not an offer to purchase your company or an agreement with respect thereto. Neither party shall have any liability nor in any way be committed to the other on account of the proposed transaction unless a definitive Agreement is executed by an authorized officer, and approved by the Boards of Directors and shareholders of the Company and Chromalloy, and thereafter any liability shall be only under the terms of the definitive Agreement.

There is substantial evidence to support the district court's conclusion that there is not a reasonable probability that appellant would prevail on its contention that Missouri shareholders were misled by Porter's failure to disclose the exact details of the proposed Chromalloy merger.[9]

## II. Irreparable Harm

In order to obtain preliminary injunctive relief, Missouri also has the burden of demonstrating that it would suffer irreparable injury absent the issuance of an injunction. *See Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 60, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12, 21 (1975); *Minnesota Bearing Co. v. White Motor Corp.,* 470 F.2d 1323, 1326 (8th

---

**9.** Although we do not intend to speculate as to the motive of the Missouri management in negotiating a merger with Chromalloy at the exact time Porter was executing a tender offer for Missouri shares, it has been noted that a target company of a tender offer frequently utilizes a merger as a device for defeating an apparent management takeover. *See* Note, *Cash Tender Offers,* 83 Harv.L.Rev. 377 (1969).

> [T]he target [company] may hastily arrange an apparently attractive merger with a third company; such defensive mergers may persuade the shareholder to stick with the target company in the belief that the merger arrangement will prove more profitable than tendering.

*Id.* at 379–80 (footnote omitted).

Cir. 1973). In attempting to sustain this burden, appellant has alleged that it would suffer irreparable harm in two distinct ways. First, Missouri contends that the failure to issue an immediate injunction will allow Porter to seize control of Missouri and to terminate the litigation in the instant case, so that any possible damage would become irreparable. In this regard, Missouri alleges that the shares held by Porter were acquired unlawfully and that it would be inequitable to allow the retention of shares improperly obtained. Second, appellant asserts that Porter will liquidate the assets of Missouri and that the Missouri shareholders would be irreparably harmed by such a liquidation.[10]

█ We conclude that appellant has not sustained its burden of demonstrating that the Missouri shareholders would suffer irreparable harm if an injunction is not granted in the instant case. Appellant has not yet attempted to exercise control of Missouri and it is not clear that Porter could execute voting control of Missouri[11] and terminate litigation in the instant case *before* appellant could obtain a restraining order preventing such a takeover.[12]

█ Nor are we convinced that Missouri's shareholders will suffer irreparable harm from an attempt by Porter to liquidate the assets of Missouri.[13] It has not been shown that Porter could execute the voting control in the immediate future necessary to accomplish a policy of liquidation. Moreover, we do not believe the district court's finding that Porter has no present plans to liquidate the assets of Missouri was clearly erroneous.

█ It does not appear that an injunction is necessary to protect the interests of Missouri shareholders who either sold their stock to Porter or would not have invested had they known of the disclosure violations allegedly committed in the instant case. Those shareholders have an adequate remedy at law through an action for damages. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 60, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12, 21 (1975).

Appellant's request for divestiture or deprivation of voting rights by preliminary injunction is a remedy more drastic than the circumstances of this case require. As the Supreme Court in *Hecht Co. v. Bowles*, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944), observed:

> We are dealing here with the requirements of equity practice with a background of several hundred years of history. * * * The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. We do not believe that such a major departure from that long

10. The district court did not reach the question of whether appellant would suffer irreparable harm.

11. The record discloses that Missouri's bylaws provide for a classified board of twelve directors. Four directors are elected for three-year terms at each annual meeting. Furthermore, Missouri's articles of incorporation provide for cumulative voting. Therefore, even though Porter has acquired 52.1% of Missouri's outstanding shares and could seek corresponding board representation, Porter would not be able to achieve board representation consistent with its stock ownership until the third annual meeting—unless Porter obtained a modification of the bylaws. Porter's disclosure in its tender offer indicates it has no such intention to modify the bylaws or seek immediate control.

12. If appellees, contrary to their representations, would attempt to obtain immediate operating control at the next shareholder meeting, we are confident there would be sufficient time for the incumbent Missouri management to obtain appropriate relief in the district court.

13. We do not reach the question of whether liquidation is harmful per se.

tradition as is here proposed should be lightly implied.

*Id.* at 329–30. Neither divestiture nor deprivation of voting rights would return the tendering shareholders the higher price on which Missouri asserts they would have insisted if Porter had not depressed the market. Moreover, appellant has failed to establish by persuasive evidence that nontendering shareholders will be irreparably harmed.

▪ In summary, appellant has failed to sustain its burden of demonstrating either a substantial probability of success or irreparable injury absent the issuance of an injunction. Under the circumstances of this case, the district court did not commit an abuse of discretion in denying preliminary injunctive relief.

Affirmed.