United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 1, 2005**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

———————

No. 04-10030

———————

R2  INVESTMENTS LDC,

Plaintiff-Appellant,

versus

JOHN D. PHILLIPS, ET AL,

Defendants,

JOHN D. PHILLIPS; BRYAN D. YOKLEY; MARTIN D. KIDDER; W. TODD CHMAR; WALTER J. BURMEISTER; KIRBY J. CAMPBELL; BRYAN CIPOLETTI; STEPHEN J. CLEARMAN; JOHN P. IMLAY, JR; MASSIMO PREIZ OLTRAMONTI; JOHN P. RIGAS; CARL E. SANDERS; DRU A. SEDWICK; LAWRENCE C. TUCKER; MICHAEL F. MIES; HENRY C. LYON,

Defendants-Appellees.

———————————————————————————

Appeal from the United States District Court
For the Northern District of Texas

———————————————————————————

Before BARKSDALE, GARZA, and DeMOSS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Appellant R2 Investments LDC ("R2") brought suit against officers and directors of the now

bankrupt World Access, Inc. ("World Access") alleging securities fraud, common-law fraud, conspiracy and negligent misrepresentation relating to World Access's failure to complete a tender offer to repurchase certain previously issued notes.[1]  The district court granted the defendants' motion to dismiss the federal securities fraud claims for failure to state a claim and declined to exercise supplemental jurisdiction over the remaining state law claims.  R2 filed this appeal.

I

In conjunction with a 1999 merger, telecommunications company World Access issued $300 million in debt instruments, referred to by the parties as 13.25% Senior Notes (the "Notes").[2]  In 2000, World Access filed multiple statements with the Securities and Exchange Commission ("SEC") acknowledging that, as a result of an April 2000 sale of assets, it was obligated under the terms of the Notes' indenture to make a tender offer by January 2, 2001 to repurchase approximately $160 million of the Notes.  During the same period, World Access filed an expedited declaratory judgment

---

[1]  R2's complaint identifies John D. Phillips as Chairman and CEO of World Access, Bryan D. Yokley as Executive Vice-President and Chief Financial Officer, Martin D. Kidder as Vice President and Controller, W. Todd Chmar as Vice President and Secretary, Michael F. Mies as Vice President of Finance and Treasurer, Henry C. Lyon as Vice President and Corporate Controller. Walter J. Burmeister, Bryan Cipoletti, Kirby J. Campbell, Stephen J. Clearman, John P. Imlay, Jr., Massimo Preiz Oltramonti, John P. Rigas, Carl E. Sanders, Dru A. Sedwick, and Lawrence C. Tucker are listed as directors.

R2's claim also named World Access's accounting firms, Ernst & Young and Ernst & Young US LLP as defendants, but R2 does not appeal the dismissal of its claims against those defendants.

[2]  The recited facts are taken from R2's complaint.  For purposes of a Rule 12(b)(6) motion we accept the facts alleged by the plaintiff as true and construe them in the light most favorable to the plaintiff. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir. 2001).  As recognized by the district court, a court may also take judicial notice of documents in the public record, including documents filed with the Securities and Exchange Commission ("SEC"), and may consider such documents in determining a motion to dismiss. *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996) (adopting the rule that courts may consider documents required to be filed with the Securities and Exchange Commission, but holding that such documents should be considered only for their content and not for the truth of the statements contained therein).

2

action in the United States District Court for the Northern District of Georgia asking the court to declare that World Access was in fact not obligated to make the tender offer. The district court refused to issue the declaratory judgment on December 20, 2000, and World Access made the required tender offer on January 2, 2001.

The tender offer stated, in relevant part, that "if holders tender at least $161,357,000 aggregat e principal amount of Notes, World Access will pay total consideration of approximately $160 million, provided that under the terms of the Indenture World Access may only accept for tender Notes in a principal amount of $1,000 or integral multiples thereof." The tender offer further stated that Note holders had until March 2, 2001 to tender the Notes for World Access to repurchase and that World Access would repurchase the Notes on a pro rata basis by dividing the total amount of Notes tendered for repurchase by $160 million. At the time World Access made its tender offer, R2 had acquired Notes with a face value totaling $6,750,000.

On January 9, 2001, a week after making its tender offer, World Access announced that it would not complete a previously anticipated acquisition of STAR Communications ("STAR"). In a press release, World Access stated that "the financial liabilities of STAR are such that we don't feel we can close the transaction without the $120 million net cash infusion anticipated . . . ." In a Form 8-K filed with the SEC the following day, World Access stated that it had terminated its agreement to acquire STAR and that, as a result, the company's previously announced financial projections for 2001 and future periods were "no longer an indication of World Access' anticipated financial performance." The company further stated t hat it was "reviewing its business plan, taking into consideration these recent developments."

Between January 9 and February 13, 2001, R2 acquired additional Notes with a face value

3

totaling $45,300,000.

World Access announced on February 15, 2001 that it had reached an agreement with certain Note holders to redeem only $70.6 million of the Notes rather than the $160 million originally announced. R2 was unaware of and did not participate in the negotiation of this agreement. In an effort to convince R2 to consent to the reduced tender amount, World Access permitted R2 to conduct a "forensic investigation," including reviewing certain financial information and an interview with Executive Vice-President Yokley. R2 ultimately refused to agree to the reduced amount. World Access filed for bankruptcy protection in April 2001.

R2 filed suit, alleging, in addition to state law claims, that the defendants violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Act") by making material misstatements or omissions with respect to both World Access's SEC filings acknowledging its obligation to make the tender offer and the tender offer itself. The district court dismissed R2's section 10(b) claim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Because liability under section 20(a) may not be imposed absent an underlying violation of the Act,[3] the district court likewise dismissed R2's claims under that section. *See Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990). Having dismissed the federal securities claims, the district court declined to exercise supplemental jurisdiction over the remaining state law claims. *See Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992) ("Our general rule is to dismiss state claims when the federal claims to which they are pendant are dismissed.").

II

---

[3] Section 20(a) "imposes joint and several liability upon persons who 'control' defendants that violate the Exchange Act." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 862 (5th Cir. 2003).

A

"In order to state a claim under section 10(b) . . . and Rule 10b-5 [promulgated to enforce section 10(b)], a plaintiff must allege, in connection with the purchase or sale of securities, '(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiff's] injury.'"[4] *Nathenson*, 267 F.3d at 406-07 (quoting *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)). Persons asserting claims under section 10(b) and Rule 10b-5 must also satisfy the enhanced pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rule of Civil Procedure 9(b). In relevant part, the PSLRA provides that where the plaintiff alleges a material misstatement or omission, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). "To satisfy Rule 9(b)'s

_____

[4] Section 10(b) of the Securities Exchange Act makes it unlawful for any person, directly or indirectly, "[t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated to enforce section 10(b), makes it unlawful for any person, directly or indirectly, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

5

pleading requirements, the plaintiffs must 'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) (quoting *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)).

We review *de novo* the district court's decision to dismiss R2's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *Nathenson*, 267 F.3d at 406. A Rule 12(b)(6) motion should be granted only if it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 348 (5th Cir. 2002). Like the district court, we must accept as true the allegations in the complaint and construe them in the light most favorable to the plaintiff. *Nathenson*, 267 F.3d at 406. But, "we will not strain to find inferences favorable to the plaintiffs" and we will not accept "conclusory allegations, unwarranted deductions, or legal conclusions." *Southland*, 365 F.3d at 361 (internal quotations omitted). We may affirm the district court's order granting the defendants' motion to dismiss R2's securities fraud claims on any basis supported by the record. *See U.S. ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 330 (5th Cir. 2003).

B

R2's complaint alleges that in multiple SEC filings signed by at least one of the defendants World Access stated that "[b]ased on the sale of Telco Systems in April 2000, [World Access] is currently obligated to tender for approximately $160.0 million of its 13.25% Senior Notes by January 2, 2001." R2 also cites statements in SEC filings that World Access "will be obligated to tender for all or a portion of the Senior Notes at a purchase price equal to 100% of principal, plus accrued and unpaid interest . . . . The tender offer must be made within 270 days of the qualified asset sale(s)."

6

Finally, the complaint refers to statements in SEC filings that "[b]ased on the net cash received to date from the sale of Telco Systems . . . World Access is currently obligated to utilize approximately $160.0 million to retire unsubordinated indebtedness or make a tender offer for its 13.25% Senior Notes by January 2, 2001." R2 argues these statements were misleading because they were made "without ever disclosing the fact that World Access either did not have the cash to make the payments required or was relying on risky contingencies [] to supply sufficient cash for the payments."

The district court held that, even taking as true R2's factual allegations regarding World Access's financial position and defendants' knowledge thereof, R2 failed to allege actionable misstatements or omissions for purposes of section 10(b) and Rule 10b-5 with respect to World Access's SEC filings. We agree. Rule 10b-5 makes it unlawful for any person, directly or indirectly, "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b)-(c). As the district court correctly noted, "[t]he fact that World Access may not be able to complete the tender offer on time does [not] make the statement that World Access *has an obligation* to repurchase the Senior Notes untrue or misleading." (emphasis added). *Cf*. *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (finding failure to state a claim where the omitted information "adds nothing to the truthfulness or accuracy of the fact" stated); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (holding that the plaintiff must plead not only why the statement at issue is incomplete but why that incompleteness makes the statement misleading or untrue). Further, as discussed in subpart C, *infra*, R2 has not alleged facts raising a strong inference that, in the months leading up to the tender offer, any of the defendants acted with the scienter necessary for R2 to state a fraud claim under

7

section 10(b) and Rule 10b-5.

C

R2's complaint contains a separate allegation that the defendants "participated in the issuance of the tender offer for the Senior Notes at a time when World Access did not have the cash to follow through with the promises made in that tender offer." R2 claims that the defendants thus "made statements that were false when made or misleading because of material omissions, in violation of Rule 10b-5" and that "various defendants knew that these statements were false or misleading when made, while others learned about their falsity after the fact but failed to correct the prior false statements or disclose the material changes in World Access' financial condition."

The district court dismissed R2's claims of misstatement or omission with respect to the tender offer because it found that: (1) the tender offer did not constitute an actionable misstatement; (2) R2 did not allege any actionable omissions; (3) R2 failed to satisfy its duty of due diligence; (4) R2 failed to allege facts sufficient to support a strong inference of intent to defraud; and (5) R2 failed to allege what the defendants gained by virtue of the alleged misstatements and omissions. With respect to the scienter element, the district court found that "[a]t best, R2's allegations support the inference that the Individual Defendants were struggling to find a way to *fulfill* the financial obligations of World Access to R2 and other investors."[5]

We have defined scienter as an "intent to deceive, manipulate, or defraud or that severe

_____

[5] Our analysis of the sufficiency of R2's scienter allegations assumes, without deciding, that R2 has alleged facts sufficient to link each of the individual defendants to the unsigned tender offer. *See Southland*, 365 F.3d at 363 (holding that "corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue").

8

recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Southland*, 365 F.3d at 366 (internal citations, quotations and ellipsis omitted). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981). R2 must allege facts sufficient to raise a strong inference of scienter with respect to each individual defendant. *See Southland*, 365 F.3d at 365 (holding that plaintiffs claiming securities fraud against multiple defendants must "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud") (emphasis in the original). In determining whether R2 has alleged facts sufficient to give rise to a strong inference of scienter, we consider the factual allegations contained in the complaint *in toto*. *See Barrie v. Intervoice-Brite, Inc.*, No. 03-11064, 2005 WL 57928 at \*6 (5th Cir. Jan. 12, 2005).

1

After reviewing the factual allegations contained in R2's complaint, we find that R2 has not alleged facts sufficient to raise a strong inference of scienter. R2's allegations in support of its claim that the defendants acted with scienter consist in large part of contentions that certain defendants knew but did not disclose that World Access's cash on hand at the end of 2000 was insufficient to permit World Access to complete the tender offer *and* continue operation. R2 alleges that prior to the tender offer Mies sent Burmeister a cash forecast estimating that World Access would have only $168.4 million on hand at the end of 2000. R2 speculates that because "Mies and Yokley provided weekly updates on working capital, cash flow, and finances to various persons, including Defendants Phillips and Chmar . . . Mies would have told Phillips, Chmar and Yokley of his cash forecast." We

9

note, however, that the $168.4 million figure appears to be a "worst case" estimate, and that the letter accompanying the forecast specifically notes that it does not include a "likely" scenario. R2 also alleges that Phillips and Chmar were aware before the tender offer of a "growing liquidity crisis"[6] and that Yokley "admitted . . . that he knew as of the end of 2000 that World Access had only $185 million in cash." Yokley's statement appears to have been taken from R2's forensic report, which states that Yokley claimed to have believed that World Access "would be capable of meeting all of its future financial obligations given its current cash position . . . and the additional cash resources he believed would soon be available from a variety of sources" including the STAR acquisition and several sources of credit. R2 also alleges that "Lyon was aware that World Access did not have enough cash on hand to complete the tender offer because he was copied on an email from a World Access employee ordering cash transfers from European subsidiaries "so that our company can meet legal obligations by year end. These legal obligations take first priority over any other payables that we have as a company, no matter who and how urgent, and are non-negotiable." Mies subsequently canceled the order, noting that "we don't have to pay until the end of February. Consequently, we will cancel the instructions . . . to transfer the money from Europe."[7]

Even assuming that R2's characterization of World Access's financial situation is accurate and

---

[6] Specifically, R2 alleges that Phillips and Chmar were aware that lenders had refused to extend or renew two lines of credit to World Access and that a third had been delayed until the end of December.

[7] R2 also alleges that "Chmar, Burmeister, Yokley, Mies, and Phillips engaged in a pattern of false reporting of World Access' financial results" referring to a November 12, 2000 memorandum in which Chmar purports to outline World Access's "options to meet our [fourth quarter] revenue projections." R2's allegations on this point are simply too speculative and generalized to contribute to its allegations of scienter. *Southland*, 365 F.3d at 361 (noting that "we will not strain to find inferences favorable to the plaintiffs" and we will not accept "conclusory allegations, unwarranted deductions, or legal conclusions").

that the alleged omission was material, we find that R2 has not alleged facts supporting a strong inference that the defendants acted with scienter in failing to make additional disclosures. Knowledge of an omission does not itself necessarily raise a strong inference of scienter. *See Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 889 (5th Cir. 1987); *SEC v. Southwest Coal & Energy Co.*, 624 F.2d 1312, 1321 n.17 (5th Cir. 1980). Where, as here, the plaintiff has not alleged a clear motive for the alleged misstatements or omissions, the strength of its circumstantial evidence of scienter must be correspondingly greater. *See Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (noting that while motive is not necessary to prove scienter, "[w]here a defendant's motive is not apparent, a plaintiff may adequately plead scienter by identifying circumstances that indicate conscious behavior on the part of the defendant, [but] *the strength of the circumstantial allegations must be correspondingly greater.*") (emphasis added). *See also Nathenson*, 267 F.3d at 411 (characterizing allegations of motive and opportunity as providing "an analytical device for assessing the logical strength of the inferences arising from particularized facts pleaded by a plaintiff to establish the necessary mental state"). R2's factual allegations suggest only that some of the defendants were aware of a "worst case" estimate of $168.4 million for World Access's end of year cash position, that Phillips and Chmar were aware that certain credit lines would not be renewed, and that Yokley expected World Access to be able to meet its future financial obligations through a combination of cash on hand and various sources of credit. The email ordering a transfer of cash from European subsidiaries does not raise a strong inference that any of the defendants knew or suspected World Access would not follow through with the Note repurchase. Rather, it suggests just the opposite ) ) that at least some of the defendants were aware of contingency plans to ensure that World Access

11

would complete Note repurchase.[8] R2's allegations are simply not sufficient, given World Access's expectation of a variety of outside funding sources and absent any allegation of motive, to raise a strong inference that in making the tender offer any of the defendants acted with an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant m ust have been aware of it." *Southland*, 365 F.3d at 366 (internal citations, quotations and ellipsis omitted).

2

R2's allegations that the defendants knew but did not disclose that World Access could not complete the tender offer without the cash expected from the STAR acquisition or that the defendants knew of a substantial risk that the STAR acquisition would not be completed are also inadequate to raise a strong inference of scienter. R2 draws its inference that World Access could not complete the repurchase without the STAR acquisition from Yokley's statement that he expected World Access "would be capable of meeting all of its future financial obligations given its current cash position . . . and the additional cash resources he believed would soon be available from a variety of sources" including the STAR acquisition and several sources of credit. R2's inference from this statement ) ) that Yokley knew at the time of the tender offer that World Access could not complete the tender without the cash expected from the STAR acquisition ) ) is unwarranted. "While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable . . . . Rather, inferences of scienter survive a motion to dismiss only if they are

[8] R2 also suggests that we can infer that the defendants acted with scienter based on World Access's efforts to obtain a declaratory judgment that the company was not obligated to make a tender offer to repurchase the Notes. To the extent that it is relevant, World Access's very public effort to avoid the obligation would seem, if anything, to weigh against a finding that the defendants were trying to deceive or manipulate Note holders in making the tender offer.

both reasonable and 'strong' inferences." *In re Navarre Sec. Litigation*, 299 F.3d 735, 741 (8th Cir. 2002) (citation and internal quotation omitted). *See also In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 150 (3rd Cir. 2004); *Greebel v. FTP Software Inc.*, 194 F.3d 185, 195 (1st Cir. 1999). Yokley's statement suggests a belief that World Access would have access to a variety of sources of cash in addition to its own cash on hand. It does not follow that Yokley knew one of those expected outside sources, the STAR acquisition, was of such importance that the tender offer could not be completed without it. Nor does it follow that, in failing to disclose that World Access expected to have a portion of the cash from the STAR acquisition available to satisfy World Access's ongoing financial obligations Yokley acted with an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Southland*, 365 F.3d at 366 (internal citations, quotations and ellipsis omitted).[9]

R2's allegation that defendants knew prior to the tender offer that the STAR acquisition would not be completed are also unavailing because R2 has not alleged facts connecting any of the defendants to the December 11, 2000 document on which the allegation is based. R2 suggests that based on this document "it seems that higher-level management would have been aware [that] the STAR acquisition would not go through." We will not, however, attribute knowledge of the document's contents based solely on the positions of the defendants. *Cf. Southland*, 365 F.3d at 363 (holding that "corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific

---

[9] We note also, of course, that World Access's allegations with respect to *Yokley's* state of mind cannot raise a strong inference of scienter with respect to the other defendants.

13

factual allegations link the individual to the statement at issue").

3

R2's allegations regarding the defendants' knowledge and actions after making the tender offer are also insufficient to raise a strong inference that any of the defendants acted with scienter in failing to make additional disclosures. R2 alleges that World Access's management informed the company's directors on January 19, 2001, after public announcement that World Access would not complete the STAR acquisition, that World Access had $185 million in cash on hand as of the end of 2000. R2 further alleges that "Chmar and Phillips (and, on information and belief, Burmeister, Yokley, and Mies)" on February 8, 2001 called a representative of the Senior Note holders with a proposal to reduce the outstanding $160 million tender offer[10] and that at the ensuing February 12, 2001 meeting World Access officers disclosed that the company's available cash at the end of 2000 was approximately $185 million and that its ongoing cash needs between January 1, 2001 and March 31, 2001 would be approximately $80 million. R2 also suggests that at the same time World Access was engaging in negotiations to restructure certain accounts payable by converting the amount owed into preferred stock. Again, we agree with the district court that these allegations are insufficient to raise a strong inference that any of the defendants acted with scienter. R2's own factual allegations make clear that World Access disclosed, a week after making its tender offer, that as a result of the

[10] We note that R2 has not explained the factual basis for its information and belief that Burmeister, Yokley and Mies participated in the telephone conversation in question. Accordingly, we decline to consider the allegation with respect to those defendants in determining the sufficiency of R2's complaint. *See* 15 U.S.C. § 78u-4(b)(1) ("[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.").

failed STAR acquisition the company would not receive a previously expected $120 million in cash, that its previous financial projections were no longer reliable, and that the company was "reviewing its business plan, taking into consideration these recent developments." In the context of World Access's previous disclosures, the time span in question, and the absence of apparent motive, R2's allegations that defendants knowingly failed to make additional disclosures regarding World Access's financial position are not sufficient to raise a strong inference of scienter.

Considering the totality of factual allegations alleged in R2's complaint and taking the facts alleged as true, we find that R2's allegations do not raise a strong inference that any of the defendants acted with an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Southland*, 365 F.3d at 366 (internal citations, quotations and ellipsis omitted). Because we find that R2 failed to allege facts giving rise to a strong inference of scienter with respect to it claims relating to the World Access tender offer, we need not consider the district court's other grounds for dismissing R2's complaint.

### III

For the above stated reasons, we hold that R2 has failed to allege an actionable misstatement with respect to World Access's SEC filings and that, considering all the facts alleged in its complaint, R2 has failed to allege facts giving rise to a strong inference of scienter with respect to either World Access's SEC filings or its January 2, 2001 tender offer. Accordingly, we AFFIRM the judgment of the district court.

15