# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 8, 2008

Charles R. Fulbruge III
Clerk

No. 07-20787

JOHN E. CATOGAS; CECILIA CATOGAS; BLANCA RODRIGUEZ;
MOHAMED BAKRY; CYBERONICS INVESTOR GROUP; EFCAT, INC.

Plaintiffs-Appellants

v.

CYBERONICS, INC.; ROBERT P. CUMMINS; RICHARD L. RUDOLPH;
ALAN TOTAH; PAMELA B. WESTBROOK; MICHAEL A. CHENEY; W.
STEVEN JENNINGS

Defendants-Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:06-CV-2121

Before HIGGINBOTHAM, DAVIS, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

At issue in this putative securities-fraud class action is the dismissal, with prejudice, of plaintiffs' complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4. Plaintiffs, who purchased Cyberonics, Inc., stock during the class period (5 February 2004 to 1 August 2006), challenge that dismissal for

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

only one of the dismissed claims: that Cyberonics and certain of its directors and officers defrauded investors by backdating and repricing executive stock options without reporting the stock-based compensation as an expense on Cyberonics' financial statements. We hold plaintiffs failed to plead loss causation with the requisite particularity. AFFIRMED.

I.

Cyberonics is a manufacturer and seller of implantable medical devices for the treatment of epilepsy and other neurological disorders. Its principal product is the Vagus Nerve Stimulation Therapy System (VNS Device): a small pulse generator implanted beneath the skin and connected to the vagus nerve in the neck.

Plaintiffs filed this action in November 2005, claiming defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act), as well as Securities and Exchange Commission (SEC) Rule 10b-5, by making false or misleading statements regarding: the likelihood that the FDA would approve the VNS Device for the treatment of depression; the marketability of the device; and its safety and efficacy.

Defendants moved to dismiss in January 2006. That July, the district court dismissed the action, ruling plaintiffs failed to plead with the specificity required by Federal Rule of Civil Procedure 9(b) and PSLRA §§ 78u-(b)(1)-(2). Contemporaneously, however, the court granted the lead plaintiff, Cyberonics Investor Group (CIG), leave to amend the complaint.

On 17 August 2006, CIG filed its First Amended Complaint (FAC), which expanded both the class period and the claims. The new claims alleged: defendants misrepresented the prospects for payer approval, i.e., insurance

company authorization of the VNS Device for depression treatment; and Cyberonics improperly accounted for stock options granted to its CEO.

Defendants again moved to dismiss; but, before the district court ruled on that motion, plaintiffs moved for leave to amend their complaint again. In April 2007, the district court denied plaintiffs' motion and stayed the action, pending the Supreme Court's disposition of Tellabs, Inc. v. Makor Issues and Rights, Ltd., 127 S. Ct. 2499 (2007).

After Tellabs was rendered, the district court lifted the stay and authorized plaintiffs to supplement their FAC. Plaintiffs filed their almost 200-page Supplemented First Amended Complaint (SFAC) in July 2007. The SFAC restated the claims in the FAC and added new claims regarding Cyberonics' stock-option practices. Most of the SFAC concerned the VNS Device. Defendants again moved to dismiss on 8 August 2007.

Regarding the challenged stock-option practices, related public activity had taken place over a year before the SFAC was filed. First, an investment analyst had published a report on 8 June 2006, raising questions about certain stock options granted by Cyberonics. (As discussed, the original complaint, which did not contest those practices, had been filed in November 2005.) The next day, 9 June, the SEC had initiated an informal inquiry into the matter. And, on 26 June, the United States Attorney for the Southern District of New York had subpoenaed documents relating to Cyberonics' stock-option grants. On the same day as those subpoenas were issued, Cyberonics announced it had designated its Audit Committee to conduct an internal investigation into the matter.

This internal investigation caused Cyberonics to delay filing its SEC Form 10-K (annual report) for fiscal year 2006 (FY06 10-K). On 11 July 2006, a year

before the SFAC was filed, Cyberonics had issued a press release, announcing: it would delay filing its FY06 10-K in the light of its internal investigation; and it had so notified NASDAQ. On 1 August 2006 (the last day of the class period), Cyberonics issued a second press release, which stated, inter alia: its internal investigation was ongoing; and its FY06 10-K filing would be further delayed. That second press release also stated that Cyberonics had received a NASDAQ Staff Determination Letter the day before, 31 July, informing Cyberonics that it was subject to delisting from the exchange if it did not file its Form 10-K. The price of Cyberonics' common stock fell from its 31 July close of $21.43 to $15.89 on 1 August, a decline of approximately 25%. (As noted, part of the stock-option-practices claim had first been raised in the 17 August 2006 FAC.)

On 20 November 2006, in a SEC Form 8-K, Cyberonics announced: it had improperly accounted for its stock-option grants; and a restatement of past financial results would be forthcoming. That restatement came in Cyberonics' belatedly-filed FY06 10-K, which was filed with the SEC on 5 January 2007. Cyberonics restated its prior financial statements to reflect approximately $18.4 million in additional compensation expense relating to stock-option grants for the 12-year period FY 1994 through FY 2005. The FY06 10-K also made several admissions, which, in plaintiffs' view, demonstrate that defendants engaged in a scheme to purposely manipulate and falsify the stock-option dates and pricing.

In October 2007, for the claims concerning the VNS Device, the district court ruled that the SFAC "fail[ed] to cure any of the deficiencies from which their original complaint suffered with regard to the particularity required for pleading misstatements, omissions, scienter, and loss causation". The court also

4

dismissed the stock-option claims, ruling that plaintiffs did not plead sufficient facts to raise a "strong inference of scienter", as required by the PSLRA.

## II.

The Rule 12(b)(6) dismissal of the SFAC is reviewed de novo. E.g., Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc., 497 F.3d 546, 550 (5th Cir. 2007) (citing Nathenson v. Zonagen, Inc., 267 F.3d 400, 406 (5th Cir. 2001)). For doing so, we must "consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which the court may take judicial notice". Tellabs, 127 S. Ct. at 2509. The allegations are construed in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true. Id. We may not, however, "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions". Cent. Laborers' Pension Fund, 497 F.3d at 550 (quoting Plotkin v. IP Axess, Inc., 407 F.3d 690, 696 (5th Cir. 2005)) (internal quotation marks omitted). Finally, we may affirm the Rule 12(b)(6) dismissal of the SFAC on any basis supported by the record. R2 Invs. Ltd. v. Phillips, 401 F.3d 638, 642 (5th Cir. 2005).

"To state a claim under [Exchange Act] § 10(b) and [SEC] Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities[:] (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately [injured him; i.e., loss causation]." Fin. Acquisition Partners, L.P. v. Blackwell, 440 F.3d 278, 286 (5th Cir. 2006) (citation and internal quotation marks omitted). As noted, the district court dismissed the SFAC based upon finding plaintiffs had not pleaded scienter adequately.

Plaintiffs do not appeal the dismissal concerning the VNS Device. In other words, the only claim-dismissal contested here concerns the stock options. In addition to responding to plaintiffs' contentions regarding scienter, defendants also present an alternative basis for affirming the dismissal of the SFAC: the failure to plead loss causation adequately. (Because the dismissal is upheld on that basis, we need not address whether a "strong inference" of scienter was adequately pleaded under the PSLRA. See Tellabs, 127 S. Ct. at 2499.)

The PSLRA requires plaintiffs to plead loss causation, "i.e., a causal connection between the material misrepresentation and the loss". Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005); see 15 U.S.C. § 78u-4(b)(4) ("[T]he plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages".). Dura made clear that there must be sufficient allegations that the misrepresentations caused plaintiffs' loss; it is insufficient to simply allege that the misrepresentation "'touches upon' a later economic loss". Dura, 544 U.S. at 343 (emphasis added). Plaintiffs must allege, therefore, that the market reacted negatively to a corrective disclosure, which revealed the falsity of Cyberonics' previous representations regarding the accounting for its stock options. Id. at 347 ("The complaint's failure to claim that Dura's share price fell significantly after the truth became known suggests that the plaintiffs considered the allegation of purchase price inflation alone sufficient."); see also Glaser v. Enzo Biochem, Inc., 464 F.3d 474, 477 (4th Cir. 2006) ("Dura requires plaintiffs to plead loss causation by alleging that the stock price fell after the truth of a misrepresentation about the stocks was revealed"); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 175 (2d Cir. 2005). Moreover, because publicly

disseminated information is reflected in the price of a stock traded on an efficient market, confirmatory information—that information already known to the market—may not constitute such a corrective disclosure. See Greenberg v. Crossroads Sys., Inc., 364 F.3d 657, 663 (5th Cir. 2004); Nathenson, 267 F.3d at 415.

In their reply brief, responding to Cyberonics' alternative loss-causation assertion, plaintiffs contend that Cyberonics' 1 August 2006 press release constitutes such a corrective disclosure because the release was "the first time that the market learned the full ramifications of the backdating and repricing scheme – i.e., before the August 1, 2006 press release, the investing public did not know and was never told that the illegal scheme could eventually lead Cyberonics' market to stop trading on the Nasdaq exchange". (Emphasis added.) Again, 1 August 2006, the date of the press release, is the last day of the class period.

That press release, entitled "Cyberonics Revises Guidance for FY07 And Confirms Receipt of NASDAQ Staff Determination Letter", states, in relevant part:

> Financial results and the Form 10-Q for the quarter ended July 28, 2006, as well as the Annual Report on Form 10-K for the year ended April 28, 2006 will be issued and filed upon completion of the previously announced internal review being conducted by the Audit Committee of the Company's Board of Directors regarding option grants and resolution of any disclosure and accounting issues that may arise from the results of the review. . . .
>
> . . . .
>
> . . . As anticipated in the Company's Form 8-K filed with the [SEC] on July 27, 2006, Cyberonics received a Nasdaq Staff Determination Letter on July 31, 2006 indicating that the Company fails to comply with the filing requirement for continued listing set

forth in Marketplace Rule 4310(c)(14), and that its securities are, therefore, subject to delisting from the Nasdaq Global Market.

(Emphasis added.) The remainder of the press release is irrelevant to the stock-option practices; it concerned Cyberonics' 2007 earnings guidance. Specifically, the release stated that Cyberonics did not see a return to profitability until it achieved broader third-party coverage for the VNS Device.

Although the 1 August 2006 press release (as stated, it concerned both the stock-option matter and the VNS Device) disclosed news that negatively impacted Cyberonics' stock price (as stated, it dropped approximately 25% from the previous day's close), such news did not reveal anything regarding the accounting of options that had not already been disclosed to the investing public. It had been made aware of potential problems with Cyberonics stock-option accounting by the June 2006 investment-analyst report, as well as by a Cyberonics 26 June 2006 SEC Form 8-K, which confirmed: the SEC investigation; the subpoenas from the United States Attorney; and its own internal investigation. Moreover, the investing public had also been made aware on 11 July 2006 that Cyberonics would be late in filing its FY06 10-K. As discussed, under our precedent, confirmatory information cannot cause a change in stock price. Greenberg, 364 F.3d at 665-66.

For the stock-option issue, the only information in the 1 August 2006 press release not previously disclosed to the market—potential delistment—did nothing to reveal previous misstatements with respect to Cyberonics' stock-option accounting. Cyberonics' being subject to delistment was the result of its delayed FY06 10-K filing. (Indeed, had Cyberonics concluded its internal investigation earlier in order to be able to restate its earnings in a more timely

fashion, it would not have been subject to NASDAQ delistment pursuant to the above-referenced Marketplace Rule 4310(c)(14) (requiring issuers listed on NASDAQ to file documents required by the SEC with the exchange).) It is true that the FY06 10-K was delayed due to the internal investigation into stock-option accounting, but such a relationship merely "touches upon" the earlier allegedly fraudulent financial statements; it does nothing to correct the inaccuracy of such statements or bring to light any of the alleged fraud by defendants.

On the other hand, Cyberonics' statements that did suggest inaccuracies in stock-option accounting during the class period did not significantly impact the stock price. For example, on 8 June 2006, the date the analyst released a report questioning Cyberonics' stock-option accounting, its stock closed at $23.59, down $0.20 from the previous day's close of $23.79. (We can, of course, take judicial notice of stock prices. See In re Merck & Co. Sec. Litig., 432 F.3d 261, 265 n.3 (3d Cir. 2005); see also Tellabs, 127 S. Ct. at 2509.) Furthermore, when Cyberonics filed its Form 8-K on 26 June 2006, disclosing the SEC and Department of Justice investigations, as well as its own internal investigation, the stock closed at $21.15, down $0.46 from the previous close of $21.61. On 20 November 2006, when the company announced the result of its internal investigation in another Form 8-K, the stock closed at $24.17, down $0.41 from its previous close of $21.58. And, when Cyberonics restated its past financial results on 5 January 2007, with the filing of the FY06 10-K, the stock price closed at $20.97, $0.95 higher than its previous close of $20.02.

As with the rest of the SFAC, most of its loss-causation section discussed events surrounding the FDA and the VNS Device. With respect to the stock-

option practices, the only loss-causation allegations concerned the 1 August 2006

press release. The SFAC's "loss causation" section provides in full:

182. On August 11, 2004, with FDA issuance of the Company's "Not Approvable Letter", the market learned that, contrary to defendants' earlier representations, that the FDA scientists were not satisfied with the Company's scientific evidence of safety and effectiveness, and that the advisory board's recommendation was not the only substantive hurdle to the approval of the TRD indication for the VNS Device. As a result of the shocking news of the "Not Approvable Letter," on August 12, 2004, the value of the Company's shares plunged over 40 percent, losing $9.59 from the previous closing price of $23.95 on August 11, 2004, to close on August 12, 2004 at $14.36, on heavy volume of over 27 million shares.

183. Nevertheless, the Company immediately went to work to reverse the deservedly devastating effect that the "Not Approvable Letter" had on the market, creating a second wave of stock inflation based on defendants' new misrepresentations. Defendants' efforts to again artificially inflate the price of the Company's stock succeeded, the result of unfounded and objectively unreasonable claims directed towards "confirmation" of a lucrative marketing opportunity for the Company's TRD treatment option.

184. In addition to this, for the ten year period of 1994 through 2005, defendants manipulated the dates of the approvals of the executive stock option awards to reduce the options' exercise prices, thereby increasing their own compensation, and understating the compensation expense reported for these options on Cyberonics' financial statements, including those publicly filed during the Class Period. Because of the misstatement of Cyberonics compensation expense, each of these financial statements violated GAAP, and the statements included in Cyberonics public filings, that the financial statements were fairly represented in accordance with GAPP were false. Not surprisingly, when the investment community learned that the SEC, the U.S. Attorney's Office and NASDAQ were all looking [sic] defendants' misconduct and the false financial reports, the disclosure of this combined and aggressive

regulatory action caused Cyberonics stock to drop in price and investors' losses to be realized.

185. As a result of the shocking news regarding the severely limited marketability of the VNS Device for TRD, in combination with the issues leading to the governmental investigations and a possible delisting of the Company's stock, on August 1, 2006, the value of the Company's shares plummeted again, falling $5.54 from the previous closing price of $21.43 on July 31, 2006, for a loss of over 25.8%, to close at $15.89, on heavy volume of over 5.4 million shares.

186. The almost 40% decline in Cyberonics stock on August 12, 2004, and the 25.8% decline in Cyberonics' stock price on August 1, 2006, at the end of the Class Period were the direct result of the unraveling of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Cyberonics stock price decline negate any inference that the loss suffered by plaintiff and other [putative] Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.

187. On the days in which Cyberonics stock price fell almost 40% and 25.8% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was flat. The economic loss, i.e., damages, suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate Cyberonics stock price and the subsequent decline in the value of Cyberonics stock when the defendants' prior misrepresentations and other fraudulent conduct was revealed.

(Emphasis in original.)

In sum, plaintiffs did not allege that any of the above-discussed non-August 2006 statements constituted a corrective disclosure—perhaps because the stock price did not drop significantly on any of those dates. Although the stock price dropped dramatically on the day of the 1 August 2006 press release, no new facts concerning Cyberonics' stock-option accounting were disclosed in

that release which demonstrated that the "truth became known" about Cyberonics' challenged financial statements. Dura, 544 U.S. at 347. Therefore, "a causal connection between the material misrepresentation and the loss" was not adequately pled. Id. at 342 (emphasis added).

## III.

For the foregoing reasons, the judgment is AFFIRMED.